**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Alex DeLAURENTIS et al., Defendants-Appellants.**

**No. 516, Docket 73–2330.**

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1973.

Decided Jan. 21, 1974.

Seymour M. Waldman, New York City. (Waldman & Waldman; Louis Waldman and Martin Markson, New York City, on the brief), for defendants-appellants.

Frank D. Allen, Jr., Atty. Dept. of Justice, Washington, D. C. (Henry E. Petersen, J. Stanley Pottinger, Asst. Attys. Gen., Phillip Wilens, Atty., on the brief), for plaintiff-appellee.

Before WATERMAN and FEINBERG, Circuit Judges, and GURFEIN, District Judge.[*]

FEINBERG, Circuit Judge:

In this extraordinary case, the United States has utilized an 1870 Civil Rights statute to prosecute three officers of a labor union for conspiring to "injure, oppress, threaten and intimidate" members of the union in the free exercise of their right not to participate in a concerted labor activity. The three defendants, Alex DeLaurentis, Hy Juvall and Willie Morales, appeal from their conviction in the United States District Court for the Eastern District of New York, after a jury trial before John F. Dooling, Jr., J.,[1] of violating 18 U.S.C. § 241. Although the conduct of these union officials may have been reprehensible, we do not believe that Congress has made it criminal. Therefore, we reverse the convictions and direct that the indictment be dismissed.

### I

The prosecution grows out of a labor dispute in early 1969 between Local 1115, Nursing Home, Hospital, Senior Citizens Hotel Employees Union, and Doctors Hospital in Freeport, Long Island. The three appellants were officers of that union, which represents blue collar workers and nurses aides at private hospitals operated by one Dr. Anton Notey. The issue at Doctors Hospital, which was one of Dr. Notey's facilities, was whether the union should be recognized as bargaining agent for the hospital's licensed practical nurses (LPN's). On April 21, 1969, DeLaurentis, Mrs. Marjorie Grogan (an LPN who had organized co-workers at the hospital) and several other LPN's met with Dr. Notey

---

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

1. Conviction was on Count II of a three-count indictment. On that count, a co-defendant was acquitted by the trial judge at the end of the Government's case. On Count I, which charged only defendant DeLaurentis with violating 18 U.S.C. § 245, the jury did not agree, and the count was subsequently dismissed. On Count III, which charged appellant Morales and a fifth defendant with violating 18 U.S.C. §§ 1510 and 2, the jury acquitted.

to tell him that a majority of the LPN's had selected Local 1115 as bargaining representative and to request union recognition on the basis of signed union authorization cards. After Dr. Notey checked the authenticity of the cards, he apparently told DeLaurentis that he would recognize the union. When word of this got out, some of the nurses advised Dr. Notey that they did not wish to be represented by a union that also represented blue collar hospital employees, and if there was to be unionization of LPN's they preferred a "professional" union, the Licensed Practical Nurses Association (LPNA). Two days later, Dr. Notey told DeLaurentis that he would not recognize Local 1115 without an election. In response, DeLaurentis, with the cooperation of Juvall and Morales, organized "sit-ins" at three hospitals (including Doctors) and a nursing home, all facilities of Dr. Notey. The purpose of the sit-ins, which lasted about four days, was to bring pressure on Dr. Notey to agree to the recognition of Local 1115 at Doctors Hospital.

The sit-ins were commenced by directing union members, when they appeared at work, to "meetings" at the hospitals. Under union rules, attendance at "shop meetings" is compulsory. At the "meetings," for which no advance notice was given, members were told of the dispute with Dr. Notey over recognition and that there would be sit-ins in sympathy for the LPN's. There was a conflict in testimony as to whether there was an opportunity to vote for approval of such concerted activity.[2] There was also a conflict as to whether the defendants compelled individuals to participate in the "meetings" or sit-ins by violence or threats of violence. Government witnesses testified to a few incidents of "violence" or threats; e.g., a nurses aide

at Doctors Hospital was shoved back into the meeting room when she attempted to go back to work; another nurses aide was told that "we have our own way of . . . taking care of people." Defense witnesses offered a more innocent version of events occurring at the sit-ins. The controversy was not settled by the jury verdict since the judge charged that neither violence nor a threat of violence was a necessary element of the crime. Instead, the judge instructed that it was enough if the defendants conspired to "overcome the will" of the employees in the sense of inducing them to do what they did not voluntarily want to do. We will assume that proof of the conspiracy as charged was sufficient since our disposition of the case does not depend on resolution of this issue.

The pressure on Dr. Notey was successful. On April 27, 1969, he agreed to recognize Local 1115 as representative of the LPN's at Doctors Hospital, and the sit-ins ended. Two series of events flowed from this unfortunate episode. One, hardly unexpected, was that rival union LPNA filed unfair labor practice charges against Local 1115 and Doctors Hospital. We are told that these were sustained by the National Labor Relations Board[3] and eventually the employees selected LPNA over Local 1115 in a close election.[4] The other aftermath of the sit-ins was much more unusual. In January 1973, appellants were indicted for[5]—and in May 1973, found guilty by a jury of—violating 18 U.S.C. § 241. After Judge Dooling denied motions for a judgment of acquittal or for a new trial, this appeal followed.

II.

The basic question before us is whether 18 U.S.C. § 241 renders crimi-

---

2. Since the district judge charged the jury that the holding of a strike vote was not a material issue, the conviction cannot be regarded as resolving this factual question.

3. On the ground that when Dr. Notey recognized Local 1115 a genuine question of representation existed.

4. LPNA won by two votes, after an earlier election had resulted in a tie vote.

5. This indictment superseded an earlier indictment.

nal the activities of defendants in this case, assuming arguendo that they committed the acts charged. Appellants principally argue that it does not, for two reasons. The first is that section 241 protects the fundamental civil rights of citizens generally, but not those rights "secured to narrow economic groups or classes under federal regulatory statutes."[6] The second asserted reason why section 241 cannot apply here is that the rights specified in section 7 of the National Labor Relations Act must be vindicated exclusively through the procedures set forth in that Act and may not serve as the basis for a prosecution under section 241. Because we find this second argument determinative, we do not decide the issues raised by the first.[7]

Section 241 provides, in relevant part, as follows:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;
>
> . . .
>
> They shall be fined not more than $10,000 or imprisoned not more than ten years, or both. . . .

Originally enacted in 1870 as part of the post-Civil War legislation to implement the rights of the newly-freed Negroes, the section has been changed only minimally in subsequent codifications. United States v. Williams, 341 U.S. 70, 71 S. Ct. 581, 95 L.Ed. 758 (1951) (Appendix). The Government's position is that the language of the statute plainly covers the activities of appellants here. Appellants conspired to "threaten, or intimidate" various union members in the "exercise" of their right not to join the sit-ins; that right is "secured" to them by the 1947 Taft-Hartley amendments to the National Labor Relations Act, 29 U. S.C. § 157 ("right to refrain from any or all [concerted] activities. . . ."); ergo, according to the Government, section 241 applies to appellants' activities.

Thus phrased, the argument seems persuasive, even compelling. But further reflection and competing considerations weaken its force. "Conspiracies" to deprive employees of rights under the National Labor Relations Act are not, after all uncommon, whether stemming from union or employer. In the almost four decades since that Act first became law, there have been untold reported violations of employee rights guaranteed by section 7 of the Act. In many of them, two or more supervisory employees are, or could be, found to have violated the Act by illegally discharging or interrogating a union adherent or by refusing to bargain with a union. Can Congress have intended the consequences of such improper, but nevertheless not uncommon acts, to be up to ten years in prison, or a $10,000 fine, or both? The thought does more than give one pause; it brings one to a halt, and to a further, more careful look at the Government's position.

Initially, we note that before this indictment, there has apparently been only one reported case in which prosecution was commenced on the same theory. And in that case—United States v. Bailes, 120 F.Supp. 614 (S.D.W.Va.1954)—the indictment was dismissed on the ground that it did not charge a federal crime. Cf. United States v. Berke Cake Co., 50 F.Supp. 311 (E.D.N.Y.), appeal dismissed, 320 U.S. 807, 64 S.Ct. 368, 89 L. Ed. 487 (1943). Although this decision hardly determines the issue of statutory construction before us, the paucity of prosecutions suggests that the "plain meaning" of section 241 may not have been so plain to everyone. Certainly, the

6.  Appellants' brief at 16.

7.  Cf. United States v. Pacelli, 491 F.2d 1108 (2d Cir. Jan. 11, 1974). Similarly, we need not deal with appellants' contentions that the evidence was insufficient to establish a conspiracy having the specific objective of interfering with federal statutory rights, and that the trial judge's charge in this respect was erroneous.

Supreme Court in construing both section 241 and an analogous statute has done far more than look to the language of the statute alone. In United States v. Johnson, 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968), the question was whether section 241 could be used to prosecute persons who had assaulted blacks exercising their right to equality in public accommodations under the Civil Rights Act of 1964. The Court concluded that the legislative history of the 1964 Act precluded criminal liability for owners of such establishments, but not for "outside hoodlums" like the defendants there. On that basis it reinstated the indictment. Three Justices dissented on the ground that the language and history of the 1964 Act prevented its use as the predicate of any criminal prosecution at all under section 241.[8] Thus, the entire Court agreed that the language and history of a particular federal statute determined whether it could serve as the source of a "right" underlying a section 241 prosecution. The significance of the case for us is that the Court rejected the simplistic course of looking only at the language of section 241.

Similarly, in United States v. Enmons, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), the Court constructed the Hobbs Act, 18 U.S.C. § 1951, under an indictment resembling the one in this case. The defendants in *Enmons*, union officials and members, were charged with conspiring to obtain moneys from an employer through use of violence far more serious than any alleged here. As in this case, the violence occurred in the course of a labor dispute and defendants were not charged with seeking personal gain, but with conspiring to advance by illegal means the aims of their union.

Although the statutory language arguably applied,[9] the Court affirmed the dismissal of the indictment. Pointing out that there had been no similar prosecution in the nearly 30 years since the Hobbs Act was enacted, the Court held that the Act did not reach violent conduct committed during a strike to achieve valid union objectives. The Court noted:

> It is unlikely that if Congress had indeed wrought such a major expansion of federal criminal jurisdiction in enacting the Hobbs Act, its action would have so long passed unobserved.

410 U.S. at 410, 93 S.Ct. at 1015. The *Enmons* opinion emphasized that statutory language and history must be "much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes." Neither language nor history, the Court said, "can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States." 410 U.S. at 411, 93 S.Ct. at 1015.

These observations are pertinent here. Until 1947, there was no "right . . . secured" by federal law not to join in concerted union activities. That statutory right came into being with the Taft-Hartley amendments of 1947. The legislative history of that enactment clearly indicates that criminal penalties were not intended for violations of the National Labor Relations Act, as amended. Thus, Senator Taft, the main architect of the 1947 amendments, stated on the floor of the Senate: "There is no criminal penalty of any sort."[10] When

---

8. Justice Marshall took no part in the consideration or decision of the case.

9. 18 U.S.C. § 1951 provides in pertinent part:

   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits

or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

10. 2 Legislative History of the Labor Management Relations Act 1371 (1948) [hereinafter Legislative History].

specifically questioned about applicability of the criminal conspiracy statutes, the Senator replied in the negative.[11] Moreover, the Hartley bill, as it passed the House, would have authorized private damage suits against those committing certain coercive acts [12] similar to the ones involved here. This provision was deleted in conference, but the House managers noted the sanctions that still remained—a criminal penalty was conspicuously absent.[13] "It seems unlikely that a Congress that was not prepared to allow civil damage suits in these circumstances [14] intended the same conduct to constitute a federal crime punishable by up to ten years in jail and a heavy fine. In addition, section 241 by its terms applies only to conspiracies; as the court said in United States v. Bailes, supra, 120 F.Supp. at 637:

> It seems unreasonable to believe that Congress would provide that the consummated violation of the rights under Section 157 would constitute only an unfair labor practice, without even a fine or any punishment as a misdemeanor, but should punish as a ten year felony the mere conspiring to do such thing.

■■ Congress has paid a great deal of attention to its enactments in the labor field. Cases construing the National Labor Relations Act in its early days

held that violation of employee rights thereunder does not carry criminal consequences.[15] There is nothing in the legislative history of the 1947 amendments to indicate that this rule was changed when the right *not* to join a union was added to those protected by section 7 of the Act. Courts, in a variety of ways, have emphasized that enforcement of rights under the Labor Act is entrusted exclusively to the Labor Board as an expert administrative agency, whose orders are reviewed by the courts. See, e.g., Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909 29 L.Ed.2d 473 (1971); Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940). Moreover, whether or not a "right" exists under section 7 of the Labor Act and whether or not that right has been violated are frequently complex questions of fact and law [16]—hardly issues that are best resolved by a jury in a criminal trial. Of course, this incongruity would not be significant had Congress clearly intended to ignore it, but such is not the case.

Against these precedents and considerations, the Government relies on various cases preceding United States v. Johnson, supra,[17] and on the broad language of section 241. None of the cited decisions involved application of that

---

11. Id. at 1371–72.

12. 1 Legislative History 79; United States v. Bailes, supra, 120 F.Supp. at 635.

13. 1 Legislative History 562–63.

14. Although it would allow them for violation of section 8(b)(4) of the National Labor Relations Act dealing with secondary boycotts. See Labor Management Relations Act § 303, 29 U.S.C. § 187.

15. S. Buchsbaum & Co. v. Beman, 14 F. Supp. 444, 448 (N.D.Ill.1936); Associated Press v. Herrick, 13 F.Supp. 897, 900 (S.D. N.Y.1936).

16. Thus, if only existing union members are the object of the alleged criminal conspiracy, as appellants assert was the case here, fine questions are raised as to the extent of the right to refrain from participating in con-

certed activities. See, e. g., NLRB v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). Similarly, cf. the many cases illustrating the difficulty of defining some of the key terms in the National Labor Relations Act: e. g., NLRB v. Metropolitan Life Ins. Co., 405 F.2d 1169 (2d Cir. 1968) (supervisor); Continental Bus System, Inc. v. NLRB, 325 F.2d 267 (10th Cir. 1963) (independent contractor).

17. E. g., United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); United States v. Guest, 383 U.S. 745, 86 S. Ct. 1170, 16 L.Ed.2d 239 (1966); United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915).

section to rights guaranteed by section 7 of the National Labor Relations Act, and *Johnson* made clear that the "plain meaning" of section 241 is not determinative. The Government also argues that the Taft-Hartley amendments themselves show that Congress did not intend to create an "exclusive remedy" in the Labor Board to remedy unfair labor practices; e.g., 29 U.S.C. § 187 provides for civil actions in federal district courts against unions engaging in certain kinds of secondary boycotts. But the argument proves too much. The care and compromise that went into that section suggest that Congress would not silently import sweeping criminal liability into the regulation of labor relations. The Government maintains that United States v. Bailes, supra, rested on erroneous conclusions and was wrongly decided. However, we believe that the reasoning of that case (which we have quoted[18]) was correct. Finally, the Government points to 29 U.S.C. § 530 to show that Congress recognized that federal court juries could in a criminal case decide issues arising out of labor problems.[19] But that section, enacted as part of the Labor-Management Reporting and Disclosure Act of 1959 to regulate internal union procedure and to protect union members against arbitrary union leadership, hardly helps the Government here. It demonstrates that when Congress imposes even modest criminal liability in this field, it does so after deliberation and scrutiny.[20]

In short, we conclude that in this case the Government has unjustifiably used federal law to convert an unfair labor practice into a criminal conspiracy. See *Bailes*, supra, 120 F.Supp. at 637. We share the Government's concern over a union's "sit-in" at a hospital, even if, as appellants contend was the case here, the sit-in is not on floors occupied by patients and there is no attempt to immobilize essential facilities or to involve nurses or professionals. And, we certainly do not imply that in this context state law cannot make criminal conduct that is violent or endangers life.[21] See United States v. Enmons, supra, 410 U. S. at 411–412, 93 S.Ct. 1007. But the application of section 241 sought here is unjustified under relevant Supreme Court precedents. Moreover we believe that the huge expansion of federal criminal liability of employer and union officials envisioned by the Government would be a shock to the 1870 Congress that enacted section 241, to the 1947 Congress that legislated the right not to join a union, and to the present Congress, as well. Accordingly, we reverse the judgment of conviction with instructions to dismiss the indictment.

18. See text following note 13, supra.

19. The section provides:

It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, 'to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter. Any person who willfully violates this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

20. 1959 U.S.Code Cong. & Admin.News p. 2497. Compare the sanctions of 29 U.S.C. § 530 (maximum fine—$1,000; maximum prison term—one year) with the much harsher penalties of 18 U.S.C. § 241 (maximum fine —$10,000; maximum prison term—ten years).

21. Apparently, there was no evidence of the latter here.