The UNITED STATES of America

v.

George Vernon HANSEN, Defendant.

Crim. No. 83–00075.

United States District Court,
District of Columbia.

June 13, 1983.
As Amended June 17, 1983.

Reid H. Weingarten, James M. Cole, Public Integrity Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

William S. Hemsley, Jr., Frank A.S. Campbell, Roy M. Cohn, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This matter is before the Court upon defendant's motion to dismiss the indictment in which he is charged with four counts of making false statements in documents within the jurisdiction of an agency of the United States, in violation of 18 U.S.C. § 1001. Defendant is alleged to have made false statements concerning his financial status on the financial disclosure reports he was required to file with the United States House of Representatives in 1978, 1979, 1980, and 1981 pursuant to the Ethics in Government Act of 1978 (EIGA), 2 U.S.C. §§ 701–09. Defendant is a United States Congressman representing the second district of the State of Idaho. Defendant makes three arguments in support of his motion to dismiss: (1) that the financial disclosure requirements of EIGA are not subject to criminal sanctions under 18 U.S.C. § 1001 because Congress intended that they be enforced only by civil measures, (2) that the Speech or Debate Clause of the Constitution protects him from any prosecution concerning his EIGA reports, and (3) that he is the victim of selective prosecution. Defendant also has filed a motion for leave to take discovery relevant to the selective prosecution issue. Oral argument on these questions was heard on June 3, 1983. For the reasons which follow, defendant's motions shall be denied.

I. *The Applicability of Section 1001 to False Statements Within EIGA Reports*

■ On its face, section 1001 proscribes the conduct allegedly committed by defendant. The section, which has general effect, essentially makes it a crime to knowingly and willfully falsify a material fact or knowingly and willfully make any false, fictitious or fraudulent statement in connection with "any matter within the jurisdiction of any department or agency of the United States."[1] This section embraces false statements made to the House of Representatives. *Diggs v. United States,* 613 F.2d 988, 999 (D.C.Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980). EIGA requires Members of the House of Representatives such as defendant to file with the Clerk of the House of Representatives annual reports of their personal financial status. 2 U.S.C. §§ 701–03. (Senators, non-voting representatives to Congress, and certain officers and employees of the Legislative Branch are also required to file such reports with the appropriate official.) Section 1001 has been held

---

1. Section 1001 provides:
"§ 1001. Statements or entries generally
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."
"[T]he term 'jurisdiction' should not be given a narrow or technical meaning for the purposes of § 1001." *Bryson v. United States,* 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

to prohibit the intentional concealment of material facts by a federal official in the course of completing a financial disclosure statement required by an agency of its employees before the enactment of EIGA. *United States v. Muntain,* 610 F.2d 964, 971 (D.C.Cir.1979).

Defendant, however, argues that it was the intent of Congress to limit enforcement of the financial disclosure report requirements to civil sanctions set forth in EIGA at 2 U.S.C. § 706. That section allows the Attorney General to bring a civil action against anyone who knowingly and willfully falsifies any information in his report or knowingly and willfully fails to file a report.[2] A maximum penalty of $5,000 may be imposed. A provision in the first draft bills of EIGA establishing criminal sanctions for falsified disclosure reports, *see* 123 Cong.Rec. 21007 (1977), was deleted from the act as it was finally passed by both Houses of Congress. Defendant argues that the deletion of the criminal penalties demonstrates Congress' intent that no criminal sanctions should apply to the falsification of EIGA reports.

**2.** Section 706 provides:

"§ 706. Failure to file or filing false reports
    The Attorney General may bring a civil action in any appropriate United States district court against any individual who knowingly and willfully falsifies or who knowingly and willfully fails to file or report any information that such individual is required to report pursuant to section 702 of this title. The court in which such action is brought may assess against such individual a civil penalty in any amount not to exceed $5,000. No action may be brought under this section against any individual with respect to a report filed by such individual in calendar year 1978 pursuant to section 701(d) of this title."

**3.** Defendant attempts to avoid the abundant authority disfavoring repeals by implication by characterizing his theory differently: he asserts that his argument is not that section 1001 is repealed by EIGA but that it is *"inapplicable"* to it. This distinction has no substance. Defendant is arguing that a general statute which, as explained above, on its face is controlling, has no force in a particular instance. This is the type of "repeal" that the Court of Appeals said could not be executed by implication in *Committee for Nuclear Responsibility v. Seaborg,* 463 F.2d at 785. "To assume . . . that the

At the outset, it must be noted that EIGA contains no express repeal or preemption of section 1001 as it applies to falsified disclosure reports. The act does specify that EIGA's provisions "shall supersede and preempt any State or local law with respect to financial disclosure," 2 U.S.C. § 708, but nowhere in the act is there an equivalent provision concerning other federal laws.

■ Nor does anything in the text of EIGA or section 1001 establish an implicit repeal or preemption by the former of the latter as it pertains to falsified disclosure reports. Repeals by implication, of course, are disfavored. *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 783, 785 (D.C.Cir.1971).[3] A repeal by implication may be found, however, only where there is "some manifest inconsistency or positive repugnance between the two statutes." *Mercantile National Bank at Dallas v. Langdeau,* 371 U.S. 555, 565, 83 S.Ct. 520, 525, 9 L.Ed.2d 523 (1963). Unless "the two acts are irreconcilable, clearly repugnant as to vital matters to which they relate, and so inconsistent that the two cannot have con-

mere passage of a specific statute covering an area of conduct also regulated by a more general statute limits enforcement of the general statute by carving out an exception to it is, in effect, to accomplish a partial repeal of the general statute." *United States v. Burnett,* 505 F.2d 815, 816 (9th Cir.1974), *cert. denied,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975).

*United States v. DeLaurentis,* 491 F.2d 208 (2d Cir.1974), upon which defendant relies for the proposition that a general criminal statute may be found inapplicable to conduct regulated by another statute notwithstanding its "plain meaning" is inapposite. That case concerned the use of 18 U.S.C. § 241, a criminal statute enacted in 1870 to protect the rights to newly-freed former slaves, as a basis for a prosecution for threats to interfere with activity protected by the National Labor Relations Act. The Second Circuit stated that "[a]lthough the conduct of [the defendants] may have been reprehensible, we do not believe that Congress has made it criminal," 491 F.2d at 209, and found that the victims' rights "must be vindicated exclusively through" the Labor Act. *Id.* at 211. In the instant case, by contrast, the clear purpose of section 1001 is to make a crime the making of false statements to the government in matters including, under *United States v. Muntain,* financial disclosure reports.

current operation," no repeal will be implied. 1A C.D. Sands, *Sutherland Statutory Construction,* § 23.10, at p. 231 (4th ed. 1972). There is no inconsistency between section 706 of EIGA and 18 U.S.C. § 1001. Section 1001 makes it a crime to knowingly and willfully falsify or conceal a fact, make a false statement, or use a false writing knowing the writing to contain a false statement. Section 706 provides a civil enforcement mechanism for the knowing and willful falsification of an EIGA disclosure report or the knowing and willful *failure to file* such a report. Nothing in one statute compels, for example, the commission of an act prohibited by the other; rather, they proscribe the same conduct and complement each other in that the civil statute attacks the lesser offense of non-filing as well as intentional false filing.

 ▇▇ Where two statutes concern the same subject, a court considering them must make every effort to reconcile allegedly conflicting provisions and give effect to both, so long as doing so does not deprive one or the other of its essential meaning. *Wilderness Society v. Morton,* 479 F.2d 842, 881 (D.C.Cir.) *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). Here, however, the prohibitory language of the two statutes does not conflict. As a result, the only matter to "reconcile" is the availability of both civil and criminal remedies for false statements in EIGA reports. This poses no problem, inasmuch as it is established that where a single act violates more than one statute, the government may elect to prosecute under either. *United States v. Brown,* 482 F.2d 1359, 1360 (9th Cir.1973), citing *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941). In *Brown,* the Ninth Circuit ruled that, assuming the making of false statements on bid forms was a violation of either of two other false statements statutes, 18 U.S.C. § 1010 or § 1012, such conduct could also be prosecuted under the general statute, section 1001, with its harsher penalties. *Accord, United States v. Burnett,* 505 F.2d at 816 (government had the option of proceeding under 18 U.S.C. § 1919, concerning false statements to obtain unemployment benefits for prior federal service, or section 1001).

Defendant also argues that since section 706 does not contain a parallel provision to that in section 704 of EIGA which provides that the Attorney General's authority to bring a civil action to enforce Section 704 "shall be in addition to any other remedy available under statutory or common law," section 1001 may not apply to the filing of false EIGA reports. Section 704 regulates the public's accessibility to filed EIGA reports. It makes it unlawful to obtain or use an EIGA report for any unlawful purpose, for any commercial purpose (outside the news media), to determine credit ratings, and for the solicitation of money. 2 U.S.C. § 704(e)(1). The civil remedy under section 704 pertains to such proscribed uses of EIGA reports. 2 U.S.C. § 704(e)(2). The language in section 704(e)(2) preserving other remedies protects the rights of filers of EIGA reports to bring suit on any private cause of action arising from the misuse of their financial disclosure information. As there is no parallel private right with respect to the requirement in section 702 to file correct reports, there is no proper analogy between section 706 (which enforces section 702) and section 704.

Nor does section 705 of EIGA, which provides that a person who relies on an advisory opinion by the appropriate congressional committee in making his disclosure report "shall not ... be subject to any sanction provided in this chapter," preclude the instant prosecution under section 1001. First, there is no assertion that defendant prepared the disclosure reports in question in reliance upon any such advisory opinion. Second, section 705 unambiguously limits its forgiveness provision to sanctions under EIGA and does not purport to preempt other remedies such as section 1001. 2 U.S.C. § 705(b).

The plain language of the two statutes shows no "manifest repugnance," no conflict that would indicate an implied repeal. It has been held that under such circumstances the inquiry ends at this point; that

it is improper to turn to legislative history to look for a repeal by implication. *Demby v. Schweiker*, 671 F.2d 507, 510 (1981) (Opinion announcing judgment of the court by MacKinnon, J., with one judge concurring in the result). In any case, as explained below, an exploration of the relevant legislative history does not yield support for defendant's contention that Congress intended section 1001 not to apply to the acts he is alleged to have committed.

■ Because EIGA and section 1001 are not irreconcilable, there must be an affirmative showing of an intention to repeal before the Court may find the criminal provision repealed by implication. *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 366 (D.C.Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). Next to the statute itself, the conference report of a bill is the most persuasive evidence of congressional intent, since it represents the final statement of the terms agreed to by both Houses. *Demby v. Schweiker*, 671 F.2d at 510 (Opinion by MacKinnon, J.). However, because the conference report of S. 555 (the bill which became EIGA), 124 Cong.Rec. 35650–72 (1978), does not discuss the deletion of the previously proposed criminal provision or the applicability of other criminal sanctions to the act, *see id.* at 35668, the parties have referred only to statements of individual Representatives in the debates.

The original Senate bill (S. 555) and various House bills preceding the enactment of EIGA contained both a criminal penalty for knowing and willful falsifications and a civil penalty for misstatements. The criminal penalties were deleted and the requirements for civil sanctions were made more stringent during deliberations on the act in the House, apparently during discussions on H.R. 13850, a proposed substitute bill. In response to defendant's argument that the deletion of the criminal penalty indicates Congress' intent that no criminal sanctions apply to EIGA, the government contends that it just as logically could be argued that the criminal penalty was removed because section 1001 rendered it superfluous and

that the requirements for the civil sanctions were heightened because of a concern that Members of Congress would be exposed to nuisance suits for inadvertent errors on their disclosure reports.

None of the statements in the legislative history referred to by defendant provide unequivocal support for his argument. Defendant quotes Representative Danielson who, discussing the particulars of H.R. 13850, noted that

> provisions of the bill do not provide for a criminal penalty but do provide for a civil penalty for failure to comply with the disclosure provisions.

124 Cong.Rec. 30414 (1978). This remark does not discuss the applicability of section 1001, and indeed does not specifically refer to false statements. It merely notes what sanctions are and are not contained within EIGA itself. The statement of Representative Moorhead that the notable improvements of the substitute bill included "the deletion of *unnecessary* criminal penalties with respect to [the] financial disclosure section," 124 Cong.Rec. 30415 (1978) (emphasis added), does not compel the conclusion that Congress felt that it was unnecessary to include criminal penalties because civil sanctions would achieve the desired result. That Congressman equally could have meant that the penalties were unnecessary because of the existence of section 1001.

Likewise, Representative Schroeder's observation that "there is no specific criminal sanction for misfiling," 124 Cong.Rec. 30419 (1978), refers to the provisions of EIGA and does not speak to the *general* criminal sanction of section 1001. Her comments at 124 Cong.Rec. 30422 (1978) under the heading "Failure to File or Falsifying Reports," to the effect that under EIGA intentional violations would be prosecuted by the Attorney General under what is now section 706 and that technical or inadvertent violations should be resolved informally, similarly present nothing addressing the applicability of criminal sanctions.

The statements of Representative Preyer at 124 Cong.Rec. 30425 (1978) cited by de-

fendant note that under the bill's compliance and enforcement provisions Members of Congress would "not be subject to any civil penalty under the act for inadvertent error or omission in the disclosure." Again, this does not address the question of whether EIGA would not be covered by other criminal sanctions but simply assures the Members of Congress that they would be protected from civil suits for minor, unintentional errors or omissions in their disclosure reports. Similarly, Representative Frenzel's remark that "now that the criminal penalties have been removed from this legislation, against my wishes, I might add, there is only a civil penalty to deter a potential nondiscloser," 124 Cong.Rec. 30430 (1978), is consistent with the applicability of section 1001 inasmuch as the criminal statute would not apply to failures to file. Nor does Representative Gonzales' comment that "it is not a criminal offense to file incorrect information," 124 Cong.Rec. 32013 (1978), suggest that section 1001 was intended not to reach the alleged conduct at issue in the instant case: the mere filing of incorrect information does not meet the requirements for a conviction under section 1001. Representative Bauman's comment that the enforcement provision of EIGA "would have been a criminal penalty, but it was changed to get the bill through the House," 124 Cong.Rec. 30457 (1978), likewise says nothing about section 1001.

Defendant simply has failed to make the "affirmative showing" of an intent to repeal required by *Izaak Walton League.* Moreover, the only statement in the legislative history of EIGA specifically referring to section 1001 is contrary to his argument. Representative Wiggins, who, according to defendant, was the Ranking Minority Member of the Select Committee on Ethics when the legislation was being developed, had this to say in the context of the removal of the act's criminal penalty for falsified disclosure statements:

Some Members have been concerned about their criminal liability. Well, they should be concerned about their criminal liability. I hope they have not been led to believe that by eliminating the criminal sanctions in this bill they have been relieved of vulnerability, because they have not.

Title 18 contains a section 1001 which makes it a felony subject to 5 years' imprisonment to willfully and knowingly file a false document or false statement. That is general law. It continues in effect, and that will apply with respect to the statements filed here. Therefore, even though there are no explicit criminal penalties in this bill, the Members will all be subject to criminal penalties if the Attorney General elects to proceed under 18 U.S.C. 1001.

124 Cong.Rec. 30429 (1978).[4] Representative Wiggins also made reference to the

---

**4.** Representative Wiggins went on to present this hypothetical:

"Let me give the Members a little scenario on how this is apt to apply. You file your statement, you make a good faith estimate of the value with respect to an asset you own. It is a good faith estimate in your own mind, but one of the persons who reads your statement is an opponent or a member of the press. He does not agree that your estimate is in fact in good faith; he thinks it is grossly understated. The press or your opponent goes to a U.S. attorney and says that he believes you have made a willfully false statement because you have significantly understated the value of an asset on your report.

"What is the position of the U.S. attorney? He has a hot potato in his hand. He has a Member of Congress who is being accused. If he pooh-poohs the allegation, he fears the publicity of cover-up, particularly if the complaint comes from the press. On the other hand, if he proceeds, he fears the problem of discrimination against a sitting Member of Congress, political manipulation, and the like.

"What does he do? Well, I will tell the Members what the typical U.S. attorney will do. He will pass the buck to the grand jury. He will in effect say, 'I am not going to decide this difficult case. He will let the grand jury make a decision.'

"Well, that is just hunky-dory, is it not? That means that whatever your legal difficulty, you are in deep trouble politically, with the grand jury being impaneled to consider a complaint made against you with respect to a misstatement or alleged misstatement filed under this section.

"So I am only reminding the Members of the vulnerability they are assuming for themselves if they adopt these provisions."
124 Cong.Rec. 30429 (1978).

applicability of general criminal statutes in the United States Code to EIGA during a discussion of a proposed amendment directed at Members who knowingly permit the use of House stationery for fundraising activities. 124 Cong.Rec. 30444 (1978). Representative Thompson reacted to this point by noting that Wiggins had "made a very important point" that "this does become a part of the United States Code, that it does involve a criminal penalty." *Id.*

It is clear from the Congressional Record that Representative Wiggins was a relentless opponent of financial disclosure requirements and that the Supreme Court has "often cautioned against the danger when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach." *NLRB v. Fruit and Vegetable Packers and Warehousemen,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). Yet Representative Wiggins' statement constitutes the *only* pronouncement on the relevance of section 1001 to falsified disclosure reports; there simply are no remarks whatsoever from any of the bill's proponents to turn to as "more accurate" explanations of its effect than Wiggins'.[5] Furthermore, the Congressional Record shows that not one Member rose to dispute what Wiggins had to say.

Representative Wiggins was not the only Member interested in the effect of criminal provisions of the United States Code upon EIGA's financial disclosure report requirements. Representative Preyer, who was the Chairman of the Select Committee on Ethics at the time, asked the Department of Justice in April 1978 for an advisory opinion on this very question as it pertained to reports filed by Executive Branch employees. A reply came in the form of a letter from then-Assistant Attorney General for Legislative Affairs Patricia M. Wald. In her letter, Judge Wald stated that it was the Justice Department's opinion that section 1001 "would apply to an Executive Branch employee who knowingly and willfully falsified a material fact in a financial disclosure statement required by bills such as [those under consideration]." Exhibit B to Government's Amended Response to Motion to Dismiss, at 2. Representative Preyer had the benefit of this opinion when he made the remarks quoted from the Congressional Record above. It is further apparent from Judge Wald's letter that Representative Preyer had also been advised by the Clerk of the House of his opinion "that the knowing and willful falsification of a material fact on a statement required to be filed by a Member of Congress, congressional employee or candidate for Congress would subject the reporting individual to the provisions of 18 U.S.C. § 1001." *Id.* at 1.[6]

The inescapable conclusion is that Congress simply did not intend to render section 1001 inapplicable to the intentional falsification of EIGA financial disclosure re-

---

5. During the final, rapidly-passing minutes of his rebuttal to the government's oral argument, defendant's counsel suggested a legislative history matter that he neither addressed in his oral argument nor his papers filed with the Court. Counsel stated that "when they [Members of the House] were discussing civil suits filed against them, so on an[d] so forth, an amendment was actually introduced to permit 1001 to survive under these circumstances, introduced, I believe, by Congressman Panetta, and that was defeated by the House. So with 1001 in front of their eyes and everything else, they excluded a criminal sanction . . . ." (Unofficial excerpt of transcript prepared for Court by Court Reporter).

The amendment to which counsel evidently referred appears at 124 Cong.Rec. 32009 (1978). It provided for a complaint procedure similar to those under federal election laws by which any person could report a violation of EIGA to the Office of Government Ethics. The amendment, as offered by Representative Panetta, stated that "[a]ny person filing such a complaint shall be subject to the provisions of section 1001 of Title 18, United States Code." *Id.* It did not concern the applicability of section 1001 to disclosure reports, nor was that issue raised during any part of the debate on the amendment. 124 Cong.Rec. 32209–11 (1978).

6. Counsel for the government stated at oral argument that the government attempted to obtain the opinion of the Clerk of the House but was unable to do so because it is an "internal document."

ports—otherwise, a specific repealing or exempting clause would have been included in the act. Indeed, the form issued by the Clerk of the House upon which Members of Congress are to make their financial disclosures carries at the signature line the following warning:

> NOTE: Any individual who knowingly and willfully falsifies, or who knowingly and willfully fails to file this report may be subject to civil and criminal sanctions. See 2 U.S.C. § 706 and 18 U.S.C. § 1001.

Exhibit A to Government's Amended Response to Motion to Dismiss, at 1. At the hearing, the parties were unable to advise the Court precisely from where came this language other than to opine that it was placed on the form by the Office of the Clerk of the House, nonetheless it evidently has appeared on such forms for a number of years without question from the many Members of Congress and legislative employees who have had occasion to execute the document.[7]

II. *The Relevance of the Speech or Debate Clause to Reports Filed by Legislators under EIGA*

■ Defendant argues that the filing by Members of Congress of financial disclosure reports under EIGA constitutes "legislative activity" protected by the Speech or Debate Clause of the Constitution.[8] It does not. The Speech or Debate Clause protects Members of Congress from judicial inquiry into their legislative acts or the motivation for the actual performance of their legislative acts. *United States v. Brewster,* 408 U.S.

501, 509, 92 S.Ct. 2531, 2536, 33 L.Ed.2d 507 (1972). The filing of an EIGA report is not a "legislative act," nor bears upon a legislator's motivation for any legislative act.

*Brewster* was the prosecution of a former United States Senator indicted under a general criminal statute for allegedly accepting a bribe in exchange for a promise relating to an official act, *i.e.,* agreeing to vote a particular way on certain legislation. The Supreme Court held that the Speech or Debate Clause would not preclude the Senator's prosecution because an examination of the indictment and the criminal statute upon which it was based "reveal[ed] that no inquiry into legislative acts or motivation for legislative acts [was] necessary for the Government to make out a prima facie case." 408 U.S. at 525, 92 S.Ct. at 2544.

Defendant asserts that because the Constitution confers upon each House the authority to discipline its members, U.S. Const. art. I, § 5, and because the House may discipline its members for matters relating to financial disclosure reports filed with its Clerk, the filing of such reports falls within the protection afforded "legislative activity" by the Speech or Debate Clause. *Gravel v. United States,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), cited by defendant, does not support this proposition, nor does *Brewster,* decided the same day. In *Gravel,* the Supreme Court declared that

> Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other mat-

7. A memorandum from the Clerk of the House to "All Members, Officers and Employees Required to File Financial Disclosure Statements Under Rule XLIV [of the House of Representatives]," a copy of which was submitted to the Court on June 8, 1983 by defendant, advised of the instant prosecution and stated that "this office takes no position on [the] question" of "whether [section 1001] applies to filings under the Rule." (In Rule XLIV, section 2, the House adopted the financial disclosure obligations of EIGA as its own internal rule.)

This memorandum has no bearing on the matters at issue here. No matter what the opinion of the Clerk of the House might be at the present about section 1001's relevance to

financial disclosure requirements, the memorandum does not alter the fact that the Clerk of the House in 1978 evidently put the Chairman of the House Select Committee on Ethics on notice that the section would apply to reports filed pursuant to EIGA. Moreover, the memorandum only refers to section 1001's effect on statements required by the internal House Rule—it carefully avoids mention of the section's applicability to reports compelled by EIGA.

8. The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. Const. art. I, § 6.

ters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either house, but "only when necessary to prevent indirect impairment of such deliberations." *United States v. Doe,* 455 F.2d [753], at 760 [ (1st Cir.1972) (same case as *Gravel* ) ].

408 U.S. at 625, 92 S.Ct. at 2627. Defendant has not shown, nor can this Court divine, any reason why the instant prosecution for false statements would cause "indirect impairment of such deliberations." Nor does this prosecution "threaten the integrity or independence of the [House] by impermissibly exposing its deliberations to executive influence." *See id.* Furthermore, the Speech or Debate Clause "does not privilege [a Member of Congress] to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Id.* at 626, 92 S.Ct. at 2627.

"The question is whether it is necessary to inquire into how [defendant] spoke, who he debated, how he voted, or anything he did in the chamber or in committee in order to make out a violation of this statute." *Brewster,* 408 U.S. at 526, 92 S.Ct. at 2544. This prosecution does not make it necessary to inquire into any of these areas because it only refers to defendant's statements on his financial disclosure report, statements which this Court holds are simply outside of the deliberative and communicative functions of the House.

The Second Circuit came to the identical conclusion in *United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2437, 2438, 77 L.Ed. 2d 1322 (1983). In that case, involving the prosecution of several Members of Congress arising from the "Abscam" operation, Representative Lederer objected to the introduction at trial of his EIGA financial disclosure report, asserting that it was privileged under the Speech or Debate Clause. In that report Lederer falsely listed his share of a bribe as a "consulting fee." *Id.* at 849. The court held that the report was not privileged by the clause, stating that

Though the Clause, in covering "legislative acts," *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), extends beyond words spoken during legislative debate any other matters it reaches "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings. . . ." *Id.* Disclosure of income from sources other than employment by the United States, *see* 2 U.S.C. § 702(a)(1)(A), is no part of such "deliberative and communicative processes."

*Id.* (citations omitted). In reaching this holding, the court also noted that "[p]rosecutions for falsification of similar statements indicate that Lederer's financial disclosure statement was not shielded [by the Speech or Debate Clause]." *Id.,* citing *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955) (prosecution for false statement to House Disbursing Office); *United States v. Diggs.*

Defendant places heavy reliance on *United States v. Eilberg,* 465 F.Supp. 1080 (E.D. Pa.1980). There, the court ruled that the testimony of a Member of Congress before the House Ethics Committee was privileged by the Speech or Debate Clause, citing language in *Gravel* to the effect that a Member's conduct at committee hearings is "within the sphere of legitimate legislative activity." *Gravel,* 408 U.S. at 624, 92 S.Ct. at 2626, *quoted in Eilberg,* 465 F.Supp. at 1083. The committee, the *Eilberg* court stated, "was engaged in the very function the Speech or Debate Clause protects—the right of Congress to preserve its independence by disciplining its own members. This right to discipline is one of the matters 'which the Constitution places within the jurisdiction of either house.' " *Eilberg,* 465 F.Supp. at 1083, *quoting Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627.

The portion of *Gravel* quoted by the *Eilberg* court is within the extended quotation from that case above in this Memorandum Opinion. When the brief passage is read in context, it is clear that to the extent that the privilege embraces such "other matters" within the House's jurisdiction, it only applies *"when necessary to prevent indirect impairment of such deliberations." Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627 (emphasis added). It is difficult to see how applying the Speech or Debate Clause privilege to the *Eilberg* defendant's *testimony*—as opposed to the Committee members' statements and questions—could have been "necessary" to prevent impairment of the Committee's deliberations. The mere fact that Congress may provide some internal inquiry or sanction for certain misconduct of its members does not thereby insulate its members from all possible criminal liability for such actions. In any case the facts of *Eilberg* are distinguishable from those of the instant matter, which does not involve any statements made on the floor of the House.

Any suggestion that Congress intended that discipline of members for failures to comply with EIGA's provisions be kept an in-house matter is completely belied by the fact that Congress specifically opened the act's disclosure requirements up to external scrutiny by vesting in the Attorney General the authority, under section 706 of the act, to bring civil actions to prosecute violations of those requirements. Moreover, that EIGA is a three-branch plan in which officials of the executive and judicial branches have equal disclosure obligations to those of legislative branch officials demonstrates that the disclosure requirements have a broader purpose than mere internal policing but also concern the public's right to know about the financial interests of its governmental leaders.

Accordingly, the Speech or Debate Clause does not privilege defendant from prosecution for the matters alleged in the indictment. The government can make out a prima facie case without having to inquire into any legislative acts or the motivation therefor. The remaining question relevant to this issue is whether defendant has the right to an immediate, pretrial appeal of this portion of this Court's decision.

■ The government acknowledges that pretrial appeals from denials of motions to dismiss generally are permissible under the rule of *Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979). In fact, the Supreme Court held in that case that a pretrial motion rejecting a Speech or Debate Clause defense is a "final decision" creating appellate jurisdiction under 28 U.S.C. § 1291. 442 U.S. at 506, 99 S.Ct. at 2448. Nevertheless, the government suggests that the Speech or Debate Clause defense asserted in this case is frivolous, and therefore contends that despite *Helstoski* no pretrial appeal is available.

There apparently is no precedential authority for the proposition that *Helstoski* does not apply to a frivolous Speech or Debate Clause defense. As such, the government relies on analogy to a line of cases beginning with *United States v. Dunbar,* 611 F.2d 985 (5th Cir.), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980), concerning pretrial appeals of denials of "frivolous" double jeopardy motions made pursuant to the rule of *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

Under the *Dunbar* rule, an appeal of a denial of a double jeopardy motion does not divest the District Court from jurisdiction to proceed with the trial of the case where the District Court makes a written finding that the appeal is frivolous. 611 F.2d at 989.

Defendant aptly points out a significant problem with this analogy. Unlike Speech or Debate claims, which only may be raised in prosecutions having some relation to Congress' legislative functions, double jeopardy arguments conceivably can be raised in any type of case where circumstances warrant. The likelihood of abuse of the appeal right through the assertion of frivolous claims is much greater in the *Abney* context. *See United States v. Brizendine,* 659 F.2d 215, 225–26 (D.C.Cir.1981) (noting suspected abuse of double jeopardy claims

in the Ninth Circuit). Accordingly, this Court is not persuaded that the *Dunbar* rule should apply to the denial of a motion to dismiss based on Speech or Debate Clause arguments.

The lack of precedent regarding frivolous pretrial appeals on Speech or Debate grounds and this Court's view of what the rule should be do not, of course, preclude this Court from entering written findings, if appropriate, as to whether the appeal is frivolous. Yet although the Court finds defendant's arguments on this issue unpersuasive and devoid of merit, the Court nonetheless declines to make such findings. Considering that the suggested potential for abuse of the appeal right in double jeopardy cases (or at least the magnitude thereof) is not present in cases such as this, the Court does not find it appropriate to rely here upon the standards for determining an appeal "frivolous" in those cases.

### III. *Selective Prosecution*

Defendant argues that he was singled out for prosecution because of his history of confrontation with and criticism of the executive branch. He asserts that this constitutes a violation of his right to equal protection of the law under the fifth amendment to the Constitution. He also seeks discovery on the issue of selective prosecution. Defendant has failed to establish even a colorable claim of unconstitutional selective prosecution. As a result, the defendant's argument that the indictment should be dismissed on this ground is rejected and his request for discovery on the issue is denied.

There is a two-pronged test for establishing a prima facie case of selective prosecution: (1) that others similarly situated were not prosecuted (*i.e.,* there was a selection) and (2) the decision to select the defendant for prosecution was improperly motivated. *E.g., Attorney General of the U.S. v. Irish People, Inc.,* 684 F.2d 928 (D.C. Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). Accordingly, while some forms of conscious selection are permissible, *United States v. Diggs,* 613 F.2d at 1003, "[t]wo kinds of motives [for selection] are apparently impermissible: those which have no rational basis under the statutory scheme being enforced, and those which are in and of themselves violative of the Constitution." *Irish People,* 684 F.2d at 935. Discovery on the issue is permitted only where the defendant can make a "colorable claim of discriminatory prosecution." *Diggs,* 613 F.2d at 1003 n. 87.

Defendant has failed to show that there has been any selection. He has not directed the Court's attention to anyone *similarly* situated who has not been prosecuted. Defendant makes reference to a report of the Comptroller General dated May 30, 1980 and has provided a copy of another report of the Comptroller dated March 4, 1981 to the effect that numerous persons subject to the requirements of EIGA failed to file their reports timely. Motion to Dismiss at 62; Exhibit II to Motion to Dismiss. He asserts that none of these (unidentified, it should be noted) persons were investigated by the Justice Department and that this demonstrates discrimination. It does not. None of these people could be prosecuted under section 1001 since that statute does not apply to mere failures to file.

Next, defendant asserts that the government's failure to prosecute the Attorney General for an erroneous EIGA report proves discrimination. Yet defendant acknowledges that the Attorney General filed an amended report to correct the error. Motion to Dismiss at 63 n. 7. Accordingly, he and the Attorney General are not "similarly situated."

In his reply brief defendant submits that information in the March 1981 Comptroller General report concerning inaccuracies and omissions in pre-EIGA financial disclosure reports filed in 1978–79 pursuant to Senate Rule 42 demonstrates improper selection. Yet as those persons were not subject to EIGA, again, their position is not the same as defendant's.

Defendant also comments on various other prosecutions of Members of Congress, including the Abscam prosecution of Representative Lederer in *United States v.*

*Myers,* asserting that they could have been, but were not, prosecuted under section 1001 for false statements in EIGA reports. Defendant emphasizes the Second Circuit's statement in *Myers* that Lederer "falsely listed [on his disclosure report] his $5,000 share of [a] bribe as 'a consulting fee.'" 692 F.2d at 849. But he and the others *were* prosecuted for other, more serious offenses. The fact that the government did not add every conceivable offense to the Abscam indictments does not show that those defendants were treated more leniently than the defendant in the instant case.

■ As defendant has made no colorable showing that he was singled out for prosecution his request for dismissal of the indictment on this ground as well as his motion for discovery are denied. Nonetheless, it can be observed that there appears to be no basis whatsoever for defendant's contention that the government harbored an improper motivation for initiating this prosecution. As noted above, in *Diggs* the Court of Appeals discerned two kinds of improper motives for selection: those lacking a rational basis under the statute being enforced and those inherently offensive to the Constitution. 613 F.2d at 1003. There can be no serious doubt that this prosecution has a rational basis under both EIGA and section 1001. Prosecuting false statements in EIGA reports is consistent with EIGA's purposes which include, *inter alia,* deterring conflicts of interest and maintaining a high level of integrity among public officials. *See* S.Rep. No. 170, 95th Cong., 1st Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4216, 4237–38. It also is consistent with the purpose of section 1001 to ensure that people do not intentionally make false statements to agencies and departments of the government.

Instead, defendant argues generally that the government is out to punish him for exercising his rights under the first amendment to speak out against the executive branch and, in particular, the Internal Revenue Service. However, none of the numerous materials defendant has presented as exhibits to his motion support this contention in any way. While he provides a vast number of documents of his own creation—letters to various officials, essays submitted by him to the Congressional Record, books critical of the IRS—chronicling his own crusades, but a few of the papers submitted concern the executive branch's responses to his activities. In not one of these documents is there any evidence that the government harbored a desire to punish defendant for speaking out.

One of these communications is a copy of a letter from the then-Commissioner of Internal Revenue to defendant, dated February 24, 1978, in response to defendant's letter to the Commissioner alleging numerous improprieties on the part of the IRS. The Commissioner's letter demonstrates no hostility whatsoever, but on the contrary is polite and responsive in detail to defendant's allegations. Consistently through the letter the Commissioner assured defendant that his charges would be investigated once defendant would provide more specificity as to his allegations. At oral argument defendant's counsel referred to this letter as "virtually a threat," asserting that it warned defendant to cease "hurting the morale" of IRS employees. The only portion of the Commissioner's letter to which this possibly could refer is the last paragraph, which reads:

> I have tried to be responsive to your concerns and assure you that the Service will not tolerate discrimination in either its personnel policies or its examination policies based upon religion. Any facts at all to support your allegations in this regard should be made known to me. Generalized allegations do a disservice to the thousands of dedicated people who make up the Internal Revenue Service.

Exhibit II to Motion to Dismiss. This is not a threat. Nor does it demonstrate any antagonism on the part of the Commissioner, the IRS or the executive branch toward defendant.

Similarly, the letters from the Assistant Attorney General of the Justice Department, Criminal Division, to defendant dated

December 11, 1981 and February 8, 1982 concerning other allegations of IRS misconduct provide no support to defendant's assertion that the government has a vendetta against him. *See* Exhibit VIII to Motion to Dismiss. The letter from the Chairman of the Securities and Exchange Commission to defendant dated January 14, 1983 likewise is innocuous.

For the foregoing reasons, and upon consideration of the entire record in this matter, defendant's motion to dismiss the indictment and his motion for discovery as to the question of selective prosecution shall both be denied.

It is this Court's respectful view that as the Speech or Debate Clause issue is immediately appealable, it would be more efficient for the Court of Appeals to consider the other two issues raised in the motion to dismiss at the same time. In *United States v. Myers,* 635 F.2d 932, 935–36 (2d Cir.) (pretrial appeal), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980), the Second Circuit not only ruled that a challenge to an indictment on separation of powers grounds was immediately appealable along with the Speech or Debate Clause question, but declared that it "would not be too extravagant to suggest that a Member of Congress should be entitled to pre-trial review of the denial of any legal claim that could be readily resolved before trial and would, if upheld, prevent trial or conviction on a pending indictment." The court noted that circumstances particular to Members of Congress militating in favor of a pretrial appeal of all issues were "especially compelling." *Id.* at 936.

The Court of Appeals for this Circuit has not spoken as to the matters addressed in this dictum from *Myers.* Nonetheless, the inefficiency and delay that piecemeal appeals would cause persuade this Court that the entire matter addressed this date should be submitted to the Court of Appeals at one time. The trial previously scheduled for June 20, 1983, must however, be continued pending appellate review of the instant decision.

An Order consistent with the above accompanies this Memorandum Opinion.