**UNITED STATES of America**

v.

**George Vernon HANSEN, Appellant.**

No. 84–5377.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1984.

Decided Aug. 30, 1985.

942

Nathan Lewin, Washington, D.C., with whom Stephen L. Braga and Frank A.S. Campbell, Washington, D.C., were on the brief, for appellant.

Reid H. Weingarten, Atty., Dept. of Justice, Washington, D.C., with whom James M. Cole, Atty., Dept. of Justice, Washington, D.C., was on the brief, for appellee.

U.S. Senator Orrin G. Hatch, Washington, D.C., was on the brief for himself and other members of the United States Congress as amici curiae, urging reversal.

Allan A. Ryan, Jr., Washington, D.C., was on the brief for the Institute for Government and Politics, Free Congress Foundation and Lawrence A. Withers, amici curiae, urging reversal.

Before GINSBURG and SCALIA, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court by SCALIA, Circuit Judge.

SCALIA, Circuit Judge:

Appellant, former Representative George V. Hansen, appeals from his conviction for making false statements in matters within the jurisdiction of a department or agency of the United States in violation of 18 U.S.C. § 1001 (1982), based on omissions in financial disclosure statements he filed under the Ethics in Government Act of 1978, Pub.L. No. 95–521, 92 Stat. 1824 (codified as amended in scattered sections of Titles 2, 5, 18, 26, and 28 U.S.C. (1982)) ("EIGA"). The primary issues on appeal are whether violations of the EIGA are subject to the criminal penalties of 18 U.S.C. § 1001, whether the omissions from Hansen's forms were material, and whether Hansen's trial started within the time limits established by the Speedy Trial Act, 18 U.S.C. §§ 3161–74 (1982).

I

Title I of the EIGA, 2 U.S.C. §§ 701–09, requires Members of Congress to file annual financial disclosure reports detailing, with certain exceptions, their income, gifts, assets, financial obligations, and business transactions. Hansen was indicted on four counts for failing to disclose, respectively, a $50,000 bank loan to his wife, cosigned by Nelson Bunker Hunt, on his form for 1978, an $87,475 silver commodities profit on his form for 1979, a $61,503.42 loan from Nelson Bunker Hunt on his form for 1980, and $135,000 in loans from private individuals

on his form for 1981. He was not indicted, however, under any provision of the EIGA, but rather under 18 U.S.C. § 1001, which forbids the willful filing of false statements in any matter within the jurisdiction of a department or agency of the United States.

Before trial, Hansen moved to dismiss the indictment on grounds that § 1001 was not applicable to EIGA violations, that he was singled out for prosecution in violation of the fifth amendment to the Constitution, and that the filing of financial disclosure reports under the EIGA constituted "legislative activity" protected by the Speech and Debate Clause of the Constitution, U.S. Const. art. I, § 6, cl. 1. The District Court denied the motion. *United States v. Hansen*, 566 F.Supp. 162 (D.D.C.1983). This court affirmed the order of the District Court with respect to the Speech and Debate Clause issue and found that the other two issues did not involve an appealable "final decision" under 28 U.S.C. § 1291. *United States v. Hansen*, No. 83–1689 (D.C.Cir. Aug. 1, 1983) (unpublished Order), *cert. denied,* —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

At trial, Hansen relied principally on an advice-of-counsel defense, contending that two of his attorneys had advised him that the transactions in question were not reportable. The jury rejected this defense and found the accused guilty on all four counts. Hansen appeals under 28 U.S.C. § 1291. He and *amici* [1] urge reversal on numerous grounds, only three of which warrant discussion beyond that contained in the District Court's opinions and rulings.

## II

 The most significant issue presented is whether 18 U.S.C. § 1001 has any application to EIGA violations. The language of the statute reads, in relevant part, as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Section 1001 is a statute of general applicability, designed to protect a "myriad [of] governmental activities." *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984). Its "sweeping ... language," *id.,* clearly embraces the omissions on Hansen's EIGA forms. The House Committee with which the forms were filed is a "department" for purposes of § 1001, since that term "was meant to describe the executive, legislative and judicial branches of the Government." *United States v. Bramblett,* 348 U.S. 503, 509, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955). *See United States v. Diggs,* 613 F.2d 988, 999 (D.C.Cir.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980) (false statements submitted to House of Representatives Office of Finance covered by § 1001). The subject of the forms is also a "matter within the jurisdiction" of that department, since the Supreme Court has held that phrase "should not be given a narrow or technical meaning," *Bryson v. United States,* 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969), but applies whenever there is " 'statutory basis for an agency's request for information,' " *United States v. Rodgers,* 104 S.Ct. at 1947 (quoting *Bryson,* 396 U.S. at 71, 90 S.Ct. at 359). The "request" here is made by the statute itself, which requires the forms to be filed with the Clerk of the House for transmission to the Committee, 2 U.S.C. §§ 703, 705. The fact that the Committee can take no dispositive action with regard to matters disclosed on the forms, but can only investigate and make recommendations to the full House, *see* House Rule X, cl. 4(e)(1)(B), is

---

1. One hundred twenty-three members of Congress filed an *amicus* brief arguing that Congress did not intend criminal sanctions to attach to EIGA violations. The other *amicus* brief, also on appellant's behalf, was filed by the Institute for Government and Politics, Free Congress Foundation and Lawrence Arlen Withers.

inconsequential, since the term "jurisdiction" embraces the authority to conduct an official inquiry, *see United States v. Rodgers*, 104 S.Ct. at 1947 & n. 2.

In light of the plain applicability of § 1001, Hansen misperceives the issue before us when he urges, to quote the caption of the first section of argument in his principal brief, that "Congress prescribed only a civil remedy and did not authorize criminal punishment for the submission of a false EIGA statement." Brief for Appellant at 27. It was not necessary for the Congress that enacted the EIGA to authorize criminal punishment, for that authorization had been conferred by an earlier Congress, and remained on the statute books. The precise issue is whether the Congress that enacted the EIGA *precluded* the criminal sanctions that would otherwise attach.

■ In approaching that issue, we give appellant the benefit of the doubt on a preliminary epistemological point: We will assume (without deciding) that an erroneous congressional belief, expressed in the statute or evident in its legislative history, that § 1001 did not by its terms apply, would be fully equivalent to an explicit decision to preclude its application, so that the result would be an inadvertent *pro tanto* repeal of § 1001 rather than the enactment of an obligation inadvertently subject to criminal penalties. On the other hand, we have no choice but to make appellant's task more difficult on another preliminary point: It is a venerable rule, frequently reaffirmed by the Supreme Court, that "'repeals by implication are not favored,'" *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978) (quoting *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974), quoting *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)); *see generally* 1A SUTHERLAND STATUTORY CONSTRUCTION § 23.10 (C. Sands 4th ed. 1972 & 1985 Supp.), and will not be found unless an intent to repeal is "'clear and manifest.'" *United States v. Borden Co.*,

308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939) (quoting *Red Rock v. Henry*, 16 Otto 596, 602, 106 U.S. 596, 602, 1 S.Ct. 434, 439, 27 L.Ed. 251 (1883)). It will not do to give this principle of statutory interpretation mere lip service and vacillating practical application. A steady adherence to it is important, primarily to facilitate not the task of judging but the task of legislating. It is one of the fundamental ground rules under which laws are framed. Without it, determining the effect of a bill upon the body of preexisting law would be inordinately difficult, and the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose.

■ Hansen argues that the presumption against implied repeal is inapplicable to this case, since no repeal is involved. He reasons that since there was no obligation for Members of Congress to make financial disclosures before adoption of the EIGA in 1978, there was no preexisting criminal liability to repeal. We cannot accept this resourceful characterization of the issue, which would render statutes such as § 1001 the most feeble of enactments, virtually requiring for their application to new obligations (as appellant's brief at times urges) an affirmative intent, in the legislation creating the new obligations, that they should apply. The fallacy in appellant's analysis is that it takes the presumption against implied repeal to be a rule based exclusively upon assumed substantive inertia rather than—what in our view it is—a rule based primarily upon assumed legislative practice. The major rationale of the presumption, in modern times at least, is not that Congress is unlikely to change the law—so that in the present case, where there was no preexisting criminal liability for this particular filing, the presumption would be inapplicable; but rather, that Congress "legislate[s] with knowledge of former related statutes," *Continental In-*

*surance Co. v. Simpson,* 8 F.2d 439, 442 (4th Cir.1925), and will expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction. The application of that rationale to the present case is clear: The terms of § 1001 cover falsification of EIGA financial disclosure forms; if Congress wished to exclude that coverage it would normally have said so; we will not readily conclude that it did so by implication.

■ With these principles in mind, then, we proceed to consider whether the EIGA repeals the application of § 1001 to its disclosure provisions. It does not do so expressly—even though it does take pain to exclude application of "any *State or local law* with respect to financial disclosure by reason of holding the office of Member or candidacy for Federal office." 2 U.S.C. § 708 (emphasis added). (We note in passing that, if repeal was in fact intended, this absence of express exclusion is even more strange than it would normally be since, as we shall discuss in more detail below, the threatened application of § 1001 was explicitly brought to the attention of a House committee that reported one version of the bill both by the Department of Justice and by the Clerk of the House, and to the attention of the full House, in floor debate, by two of its Members.) We look then, for some indication of implicit repeal strong enough to overcome the contrary presumption. Hansen points to 2 U.S.C. § 706, which provides:

> The Attorney General may bring a civil action in any appropriate United States district court against any individual who knowingly and willfully falsifies or who knowingly and willfully fails to file or report any information that such individual is required to report pursuant to section 702 of this title. The court in which such action is brought may assess against such individual a civil penalty in any amount not to exceed $5,000.

He argues that this provision "appears, on its face, to contain the complete sanction

that Congress has prescribed for any knowing and willful falsification." Brief for Appellant at 29. It does indeed represent the complete sanction that the 1978 Congress provided, but the question remains whether it clearly suggests a repeal of the sanction provided by earlier legislators. We think not. There is no difficulty in applying both 18 U.S.C. § 1001 and 2 U.S.C. § 706. Indeed, the two sections combine to produce a natural progression in penalties: those who intentionally fail to file EIGA forms are subject only to the civil sanction of § 706, while those who lie on their forms are additionally subject to the criminal penalty of § 1001. If this does not represent evident harmony, it at least does not begin to approach the "irreconcilable conflict" that the Supreme Court has instructed us to require as textual evidence of an implicit repeal. *Red Rock v. Henry,* 106 U.S. at 601, 1 S.Ct. 438. *See, e.g., Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982). Surely the attachment of this civil sanction is less suggestive of an intent to displace § 1001 than the attachment of a criminal sanction would be. Yet even in this *a fortiori* situation, the courts have uniformly rejected displacement claims. For example, in *United States v. Burnett,* 505 F.2d 815 (9th Cir.1974), *cert. denied sub nom. Lyon v. United States,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975), defendants argued that they should have been charged under a specific misdemeanor statute forbidding false statements to obtain unemployment benefits rather than under the felony provisions of § 1001. The Ninth Circuit disagreed:

> To assume ... that the mere passage of a specific statute covering an area of conduct also regulated by a more general statute limits enforcement of the general statute by carving out an exception to it ... is, in effect, to accomplish partial repeal of the general statute. Repeals by implication are not favored; effect should be given to overlapping statutes if possible.... In the present case the Government had the option of proceeding under either statute.

505 F.2d at 816 (citation omitted). *See also, e.g., United States v. Fern,* 696 F.2d 1269, 1274 (11th Cir.1983) (false statements made to an IRS auditor could be prosecuted under either § 1001 or a specific provision in the Internal Revenue Code); *United States v. Gordon,* 548 F.2d 743, 745 (8th Cir.1977) (false statements to obtain medicare payments could be prosecuted under either § 1001 or a more specific criminal statute); *United States v. Radetsky,* 535 F.2d 556, 567–68 (10th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976) (same); *United States v. Carter,* 526 F.2d 1276, 1278 (5th Cir.1976) (false statements in connection with Small Business Administration loan applications could be prosecuted under either § 1001 or a specific criminal provision governing the loan applications).

■ Hansen also discerns implied repeal in a difference between 2 U.S.C. §§ 706 and 704. The latter section, entitled "Accessibility of reports," deals generally with the manner in which the public obtains access to EIGA disclosure forms. Subsection 704(e) prohibits use of the forms for certain purposes (including commercial purposes, the determination of credit ratings and the solicitation of money) and authorizes a civil action by the Attorney General, similar to that in § 706, for violation of that prohibition. Unlike § 706, however, it contains the following stipulation: "Such remedy shall be in addition to any other remedy available under statutory or common law." Hansen argues that the absence of a similar provision in § 706 shows that Congress meant *that* civil remedy to be exclusive. We think not. The two statutory sections are simply not so parallel that equivalent language in this respect would be expected. Of course 18 U.S.C. § 1001 would in any event have no application to violations of § 704, so it is surely not the continuing effect of that criminal provision that was being explicitly preserved. But more importantly, § 704, unlike § 706, addresses an area where—without the specific disclaimer—it might be thought that private civil actions were precluded, notably, state actions for defamation of credit or invasion of privacy. The language of the disclaimer seems specifically directed to civil actions, since criminal sanctions are rarely described as "remedies." In sum, we agree with the District Court that the reason for spelling out the absence of preclusion or repeal in § 704 was the possibility that otherwise its provision of a civil remedy might be held to preclude private civil actions; and that "[a]s there is no parallel private right with respect to the requirement in section 702 to file correct reports, there is no proper analogy between section 706 (which enforces section 702) and section 704." 566 F.Supp. at 165.

Appellant and *amici* point out that many statutes imposing new reporting requirements explicitly provide that the criminal penalties of § 1001 will be applicable. *See, e.g.,* the Federal Pesticide Act of 1978, 7 U.S.C. § 136h(g)(3) (1982). They infer from this a constant congressional belief that § 1001 does not apply to new reporting statutes in the absence of express provision, so that that absence here is determinative. The argument is flawed as a technical matter, because it deprives § 1001 of its plainly intended self-operative effect, reducing it, insofar as subsequently enacted reporting obligations are concerned, to no more than a shorthand code to which Congress can conveniently refer when it wishes to enact criminal penalties. And it is flawed as a plausible estimation of congressional belief, since it posits that Congress has both consistently misunderstood one of the basic rules of legislation—under which § 1001 would apply to new reporting statutes absent express provision to the contrary, *see supra* pages 944–45 and consistently ignored numerous decisions holding § 1001 applicable to reporting statutes silent on the point, *see, e.g., United States v. Burnett, supra.* A much more likely explanation is that Congress included the references to § 1001 as a means of reminding those subject to the new laws of the self-operative, previously enacted sanctions, or as a means of clarifying for its own Members who voted upon the new laws the consequences of their action.

Even if one thinks the references were included for their operative effect, they necessarily establish no more than that Congress chose in some cases to make assurance doubly sure, but did not do so here. One might surmise—though it would be only a surmise—that the failure to include such redundancy in the EIGA was not mere happenstance, but was rather attributable to the belief that some Members of Congress, and perhaps even a number providing the crucial margin for passage of the bill, would have objected to the inclusion. But even if true this falls far short of establishing a belief on the part of Congress as a whole that § 1001 was not independently applicable.

■■■■ There is one other arguable textual indication of repeal, not raised by appellant or *amici*, but worthy of attention: 2 U.S.C. § 705(b), which provides for advisory opinions interpreting the EIGA to be issued by the designated committees of the House and Senate, prescribes that any individual "who, after the issuance of the advisory opinion, acts in good faith in accordance with the provisions and findings of such advisory opinion shall not, as a result of such act, be subject to any sanction provided *in this chapter.*" (Emphasis added.) Since it can hardly be thought that Congress meant the advisory opinion to be a protection against the civil sanctions of the EIGA but not against the criminal penalties of 18 U.S.C. § 1001, the italicized limitation arguably indicates a belief that § 1001 is not applicable. The point would have great force if, by reason of the limitation of the provision to sanctions "in this chapter," an advisory opinion would in fact not immunize against § 1001 criminal prosecution. But that is obviously not so. Good faith reliance upon advice of counsel would establish a defense against § 1001, *see United States v. Smith*, 523 F.2d 771, 778 (5th Cir.1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976); re-

liance upon a specifically authorized pronouncement of one of the designated committees would *a fortiori* do so. The limitation of the immunization to sanctions "in this chapter" thus creates no legislative absurdity, and is at most weak evidence of a belief that § 1001 does not apply. It may have been included simply because that is the routine formulation (so routine that it did not attract the attention of appellant and *amici* here); or because it was thought necessary to establish this defense against the new civil sanctions, but superfluous to do so against the criminal penalty of § 1001, with its well-established requirements of *mens rea, see, e.g., United States v. Mekjian*, 505 F.2d 1320, 1324 (5th Cir. 1975).

Finally, Hansen relies upon certain portions of the legislative history of the EIGA. We will not review them at length, since they are set forth and discussed fully in the opinion of the District Court. As the District Court found, while there is categorical indication in the legislative history that some Members of Congress believed § 1001 would apply by its terms to an EIGA violation, there is no *unequivocal* indication that *any* Member of Congress thought the contrary. Fairly read, however, several statements suggest the latter belief. But even if they are fully credited, they do not establish that as the belief of Congress by the "clear and manifest" evidence the Supreme Court has instructed us to require. Reading the legislative history in the light most favorable to Hansen, it reveals that both the Clerk of the House and the Department of Justice—the latter speaking to one proposed version of the EIGA that did not contain its own criminal penalty, and three proposed versions that did (which, as observed earlier, would even more strongly suggest preclusion of § 1001)—expressed to the relevant House committee the view that § 1001 would apply;[2] that the criminal sanction provisions

---

**2.** The Department of Justice's advice, contained in a letter from Assistant Attorney General Wald to the Chairman of the House Select Committee on Ethics, addressed application of § 1001 only

to Executive Branch employees, though the Clerk's advice, recited in that letter, specifically addressed its application to Members of Congress. *See* J.A. 448–50. In any case, insofar as

included in earlier House and Senate versions of the EIGA were dropped from the final bill, with the explanation by one of the bill's proponents in the House that it was done "to get the bill through the House," 124 CONG.REC. 30,457 (1978) (remarks of Rep. Bauman); and that in the House debate several Members expressed views indicating a belief that § 1001 would not apply to EIGA violations, see, e.g., id. at 30,414 (remarks of Rep. Danielson), 30,415 (remarks of Rep. Moorhead), while two Members (one an opponent and one a supporter of the bill) stated explicitly their belief that it would, see id. at 30,429 (remarks of Rep. Wiggins), 30,444 (remarks of Rep. Thompson). We simply cannot see in this a "clear and manifest" indication of congressional belief that § 1001 was excluded. To the contrary, the pattern is entirely consistent with the sort of legislative gamesmanship we described earlier, in which some Members of Congress were gambling on the expectation that § 1001 would be precluded, and others (who favored criminal penalties) were gambling on the opposite. The weakness of indication of legislative intent is highlighted when one realizes that all the expressions of views described in the foregoing legislative history pertain only to the House. We have no indication beyond the text of the statute what members of the Senate thought on this issue. For all we know, they may have receded from the criminal penalties adopted in the Senate version of the bill, see S. 555, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin. News 1978, p. 4216, reprinted in 123 CONG. REC. 21,017 (1977), only because they thought it certain or likely that § 1001 applied anyway. Precisely that explanation is suggested by the curious failure of the Joint Explanatory Statement of the Committee of Conference to mention the elimination of criminal penalties, see H.R. REP. No. 1756, 95th Cong., 2d Sess. 65–69 (1978), U.S.Code Cong. & Admin.News 1978, p. 4381, and by the curious description of the conference outcome reported to the

House floor by one of the conferees: "As in the House version, specific reference to criminal penalties was removed from this legislation." 124 CONG.REC. 36,467 (1978) (remarks of Rep. Moorhead) (emphasis added).

The District Court reached "[t]he inescapable conclusion ... that Congress simply did not intend to render section 1001 inapplicable to the intentional falsification of EIGA financial disclosure reports." 566 F.Supp. at 168–69. Accord, United States v. Claiborne, No. CR–R–83–57–WEH (D.Nev. unpublished transcript of Mar. 13, 1984 proceedings). We need not go that far. It suffices that there is not remotely—neither in the textual indications we have considered, nor in the various episodes of legislative history, nor in all of them combined—a clear and manifest indication of an intent to repeal.

Hansen appeals to the so-called rule of lenity: " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " United States v. Bass, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (quoting Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). It is, quite frankly, difficult to assess the scope of this accepted principle. One can recite, as appellee has, the Supreme Court's advice that it "only serves as an aid for resolving an ambiguity; it is not to be used to beget one." Callanan v. United States, 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961) (footnote omitted). But in truth that provides little more than atmospherics, since it leaves open the crucial question—almost invariably present—of how much ambiguousness constitutes an ambiguity. In the present case, however, we think the answer is plain. When faced with questions of interpretation relating to § 1001, pertaining to matters at least as "ambiguous" as the alleged repealer here, and not even involving the presumption against implied repeal, the Supreme Court has found

the issue of implied preclusion of § 1001 is concerned, there is little if any ground for distinction between the two applications.

the rule of lenity inapplicable. *See United States v. Yermian,* — U.S. —, 104 S.Ct. 2936, 2940 n. 7, 82 L.Ed.2d 53 (1984); *United States v. Rodgers,* 104 S.Ct. at 1948–49. Moreover, to the extent the rule is based upon solicitude for the individual defendant who violates the law before its meaning is clarified, rather than upon some more general notion that in case of doubt Congress should not be deemed to have unsheathed the sword of criminal penalty, it has no valid application here. Hansen has not only not been surprised by a novel or unexpected interpretation of the law, *cf. United States v. Mallas,* 762 F.2d 361, 363 (4th Cir.1985), but was in fact warned of its application with a specificity that a prospective lawbreaker rarely enjoys. The forms that Hansen signed all contained a warning, immediately above or below the signature line, that "[a]ny individual who knowingly and willfully falsifies, or who knowingly and willfully fails to file this report may be subject to civil and criminal sanctions. See 2 U.S.C. § 706 and 18 U.S.C. § 1001."

### III

 Hansen contends that even if § 1001 applies to his EIGA filings, he has not violated that statute because the omissions from his forms were not "material." The portion of § 1001 under which Hansen was charged, *see supra* page 942, does not explicitly require a showing of materiality, but we have held that requirement to be implicit, *see Freidus v. United States,* 223 F.2d 598, 601 (D.C.Cir.1955). As we have described the requirement:

> The test of materiality is whether the statement "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a [particular] determination." Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects.

*United States v. Diggs,* 613 F.2d at 999 (quoting *Weinstock v. United States,* 231 F.2d 699, 701–02 (D.C.Cir.1956)) (footnote omitted). Hansen argues that his omissions could not have been material because no federal agency or department "was conducting any inquiry or investigation, or making any determination whatever, that would have been affected in the slightest if Congressman Hansen had, in 1979, 1980, 1981 and 1982 put on his EIGA forms the debts and transactions which the indictment alleges he should have reported." Brief for Appellant at 53. This argument misunderstands the nature of the materiality requirement: A lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress. *See United States v. McIntosh,* 655 F.2d 80, 83 (5th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982) (false statement material because "disclosure of the truth could have provoked the agency to action"). And it is beyond doubt that information contained on (or omitted from) EIGA forms could in some cases influence the possibility of an authorized investigation by a federal department. As noted earlier, House committees are federal departments for the purposes of § 1001. As required by 2 U.S.C. § 703(d)(1), the reports filed by Hansen with the Clerk of the House were forwarded by him to the "designated committee" of the House, the Committee on Standards of Official Conduct. That is the committee charged by the House with the duty, among others, "to investigate ... any alleged violation, by a Member, officer, or employee of the House, of the Code of Official Conduct or of any law, rule, regulation, or other standard of conduct ... and after notice and hearing, to recommend to the House, by resolution or otherwise, such action as the committee may deem appropriate ...." House Rule X, cl. 4(e)(1)(B). House Rules restrict in some respects the receipt by Members of money in the form of gifts or income (Rules XLIII, cl. 3; XLII, cl. 4; XLVII) and require Members to behave in a fashion which "shall reflect creditably on the House of Representatives" (Rule XLIII, cl. 1). The Standards Committee's rules require its staff to

**950**

"present to it any evidence available to the staff reasonably indicating that any Member ... may have committed a violation" of these House Rules, and provide that the Committee shall conduct an investigation if it determines that that evidence merits further inquiry. Committee Rule XIII. Thus, the statute and the House and Committee Rules combine to authorize examination of EIGA forms and consequent investigation to detect violations of House ethical standards.

▇▇ Further addressing the "materiality" point, Hansen asserts that there was no indication that his omissions had, in the words of *Diggs, supra,* a "natural tendency to influence" any investigation, whether ongoing or potential. There is no doubt that specific disclosure of the actual transactions in question would have had such a tendency: after they came to light, the Committee undertook an investigation and concluded that the transactions violated House Rules. *See In the Matter of Representative George V. Hansen,* H.R.Rep. No. 891, Vol. 1, 98th Cong., 2d Sess. 2, 325–26, 388, 425 (1984). Hansen's point, however, is that because of the nature of the EIGA forms the required disclosure would have been too general to have influenced any investigation or action. With respect to one of the omitted transactions, a bank loan to his wife cosigned by Nelson Bunker Hunt, he notes that the only effect of including the omitted material would have been to add one more line to his form for 1978: "First National Bank of Dallas III" ("III" indicates indebtedness from $15,000 to $50,000). This, he argues, would not remotely have disclosed that aspect of the transaction which presumably violated House Rules (the fact that Hunt was guarantor of the loan) and thus would have had no "natural tendency" to provoke Committee investigation or action. Assuming that this correctly describes the reporting requirement (which is by no means clear),[3] Hansen has selected, of course, the exam-

ple best suited to his case; the other required disclosures would have been much more informative. We are of the view, however, that even a falsification of this sort comes within § 1001. The materiality requirement that we have found implicit in that provision excludes a matter unrelated to the subject of the agency's or department's responsibility—for example, misrepresenting the occupation of a corporate director where that is irrelevant to the determination at hand, *see, e.g., United States v. Talkington,* 589 F.2d 415, 417 (9th Cir. 1978). But where, as here, the falsification pertains specifically to the area the department is charged to investigate (a filing Member's financial transactions), and tends to conceal in any degree—even beyond the point where further concealment might be thought superfluous—material that would prompt or affect an investigation, we will look no further. Application of § 1001 does not require judges to function as amateur sleuths, inquiring whether information specifically requested and unquestionably relevant to the department's or agency's charge would really be enough to alert a reasonably clever investigator that wrongdoing was afoot. Here the falsifications related to financial transactions within the Committee's charge, and tended to conceal information that would have prompted investigation or action; no more is needed.

Hansen further argues that the District Court improperly withheld this materiality question from the jury. We have previously held, however, that materiality under § 1001 is a matter of law to be determined by the court. *See Weinstock v. United States,* 231 F.2d at 703. A majority of the circuits has reached the same conclusion. *See, e.g., United States v. Lopez,* 728 F.2d 1359, 1362 n. 4 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984); *but see, e.g., United States v. Irwin,* 654 F.2d 671, 677 n. 8 (10th Cir.1981),

---

**3.** *See* 2 U.S.C. § 702(d)(1)(B), requiring, in some cases, the reporting of gifts to spouses and the identification of donors. A gift is defined as a "rendering ... of ... any thing of value," 2 U.S.C. § 707(3). Free use of the credit of Nelson Bunker Hunt, which his cosignature of the loan conferred, was assuredly something of value.

*cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982).

## IV

Hansen alleges that his trial did not commence within the time limits of the Speedy Trial Act, 18 U.S.C. §§ 3161–74 (1982). The seventy-day time period specified in the Act was due to expire on February 24, 1984. On January 26, Hansen agreed to a trial date of March 19, 1984, thereby waiving his right to have the trial start sooner. The trial did not commence until March 20.

Virtually all of the time from January 26 to March 19, however, was excludable for purposes of the Speedy Trial Act's seventy-day time calculation. The Act provides in 18 U.S.C. § 3161(h)(1)(F) that periods of delay "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" may be excluded from the seventy-day period. During almost the entire period from January 26 to March 19, numerous pretrial motions filed by the government and Hansen were under consideration by the court. Likewise during this period, the Clerk of the House of Representatives filed a motion to quash a subpoena in the case, which the court considered for several weeks. Hansen asserts that delays arising from such motions had already been envisioned in the court's fixing, and the defendant's acceptance, of the March 19 date, so that that date had to be regarded as subject to no further extensions permitted by the Speedy Trial Act. Although the trial judge's order setting the trial date of March 19 did state that the extension would "allow the filing or revival of anticipated motions which might well require substantial responses by the parties," *United States v. Hansen,* Crim. No. 83–00075, slip op. at 2 (D.D.C. Jan. 27, 1984), it seems to us most unlikely that the experienced trial judge here meant to imply that the extension was final and absolute. That would have displayed a foolhardy confidence in her ability precisely to calculate the time needed to dispose of yet-unforeseen pretrial matters—such as the defendant's last-minute motion for change of venue because of prejudicial publicity, which induced the trial court to require a sequestered jury, arrangements for which caused delay of the trial from March 19 to March 20. Assuming, however, that that was what the extension to March 19 meant, the consequence of the failure to comply with it would simply be retraction of the defendant's waiver of speedy trial rights that was the *quid pro quo.* The District Court would have no authority to create a mini-Speedy Trial Act by judicial fiat, binding itself to dismissing the prosecution in advance of the time the Speedy Trial Act would allow, and even against its own judgment of what justice required. At most, then, Hansen reacquired his previously waived Speedy Trial Act rights on March 20. Since those rights would still not have entitled him to dismissal, because of the tolling of the seventy-day period described above, commencement of the trial on March 20 was lawful.

\* \* \* \* \* \*

We have carefully considered all of Hansen's other arguments and find them to be without merit, substantially for the reasons given by the District Court in its rulings and opinions below. We affirm the conviction on all counts.

*So ordered.*