United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 4, 1999 Decided March 9, 1999 

 No. 98-3094

 United States of America, 

 Appellee

 v.

 Henry G. Cisneros, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (97cr00485-01)

 Barry S. Simon argued the cause for appellant. With him 
on the briefs were Brendan V. Sullivan, Jr. and Marcie R. 
Ziegler.

 Mathew S. Rosengart, Senior Associate Independent Coun-
sel, argued the cause for appellee. With him on the brief 
were David M. Barrett, Independent Counsel, James P. 


Fleissner and Mark V. Jackowski, Senior Associate Indepen-
dent Counsel.

 Before: Henderson, Randolph, and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: Henry G. Cisneros, former Sec-
retary of Housing and Urban Development, brings this appeal 
from an order of the district court denying his motion to 
dismiss Counts 1 through 18 of a 21-count indictment re-
turned against him, two of his former employees (Sylvia 
Arce-Garcia and John D. Rosales) and Linda D. Medlar, his 
one-time girlfriend. Independent Counsel David M. Barrett 
prosecuted the case. Cisneros sought a dismissal on the 
ground that any adjudication of the charges against him 
would run afoul of the separation of powers doctrine. The 
first and, as it turns out, the only question we must decide is 
whether we have jurisdiction to hear the appeal despite its 
interlocutory nature.

 I

 The Presidential Transition Act of 1963 declared the pur-
pose of Congress to promote "the orderly transfer of the 
executive power in connection with the expiration of the term 
of office of a President and the inauguration of a new 
President." Presidential Transition Act of 1963, Pub. L. No. 
88-277, 78 Stat. 153 (1964) (codified at 3 U.S.C. s 102 
(notes)). One of the immediate tasks facing any newly-
elected President is to begin forming a Cabinet. For a 
smooth transition, the selection of potential nominees, the 
investigations of their backgrounds, and the adjudications of 
their security clearances must begin well before the President 
takes the oath on January 20th. U.S. Const. amend. XX, s 1.

 To these ends, President-elect Clinton and Warren Christo-
pher, the head of his transition team, signed a Memorandum 
of Understanding with Attorney General Barr of the outgoing 
Bush Administration a few days after the November 1992 
election. Indictment, Background, at p. 6, pp 5-6. The Mem-
orandum stated that upon written requests of President-elect 

Clinton, the FBI would conduct background investigations of 
his prospective nominees. Memorandum of Understanding at 
1. According to the Memorandum, the FBI would have two 
principal objectives in conducting its investigations. First, it 
should "ascertain facts and information relevant to the candi-
date's suitability for Federal government employment ... in 
accordance with Executive Order 10450," id. Second, it 
should compile information to "permit adjudication of the 
candidate for clearance for access to Sensitive Compartment-
ed Information, when necessary, in accordance with the stan-
dards set forth in Director of Central Intelligence (DCI) 
Directive 1/14." Id.

 Executive Order No. 10450, relied upon in the Memoran-
dum of Understanding, has been in effect since President 
Eisenhower issued it in 1953. In order to ensure that all 
officers and employees would be "reliable, trustworthy, of 
good conduct and character, and of complete and unswerving 
loyalty to the United States," Executive Order No. 10450 
directed investigators to develop information regarding the 
candidate's "deliberate misrepresentations, falsifications, or 
omissions of material facts," any "criminal" or "dishonest" 
conduct on the individual's part, facts concerning the candi-
date's susceptibility to "coercion, influence, or pressure which 
may cause him to act contrary to the best interests of the 
national security," and other behavior by the candidate indi-
cating that he is "not reliable or trustworthy." Executive 
Order No. 10450, 18 Fed. Reg. 2489 (1953). The informa- 
tion developed by the FBI would be used, not only by the 
President-elect, but also by the Personnel Security Office of 
the Department of Justice in determining whether to grant 
the candidate a national security clearance.

 After President-elect Clinton identified Cisneros as a po-
tential nominee for HUD Secretary, Cisneros completed a 
"Questionnaire for Sensitive Positions (For National Securi-
ty)," commonly known as an "SF-86." Indictment, Back-
ground, at pp. 13-14, p 19. Pursuant to the Memorandum of 
Understanding, Cisneros's SF-86 and a written request from 
President-elect Clinton triggered the FBI's full-field investi-
gation. Although the conspiracy count (Count 1) of the 


Indictment stretches from the summer of 1992 through Sep-
tember 1994, the focus of this count and the other counts 
naming Cisneros (Counts 1 through 18) is the period between 
the election of President Clinton in November 1992 and the 
appointment of Cisneros as HUD Secretary in late January 
1993.

 According to the charges, Cisneros set out to deceive the 
FBI and the Department of Justice, all to the end of ensuring 
his nomination, confirmation, appointment and continuation in 
office. What Cisneros wrote in his SF-86 and what he said to 
FBI special agents in two background interviews are at the 
heart of the case. It would serve no useful purpose to recite 
each of the counts in detail. Suffice it to say that if the 
charges are proved, Cisneros repeatedly lied about and con-
cealed the fact that he had paid large amounts of money to 
Medlar ($44,500 in 1990; $73,000 in 1991; $67,500 in 1992); 
that even during the FBI's investigation of him from Decem-
ber 1992 through early January 1993, he continued to pay 
Medlar while denying that he was doing so; that although 
Cisneros stated on a supplemental SF-86 that he was not 
subject to blackmail and although he told the FBI that 
Medlar had not threatened or coerced him, he continued 
making payments because Medlar was still threatening to 
expose him; that Cisneros illegally structured some of these 
payments to avoid having a Currency Transaction Report 
filed, itself a felony (see 31 U.S.C. ss 5324, 5322(a); Ratzlaf v. 
United States, 510 U.S. 135 (1994)); and that he failed to file 
gift tax returns with the Internal Revenue Service reporting 
his payments to Medlar. (After the magnitude of the pay-
ments became known in the summer of 1994, the IRS opened 
an investigation of Cisneros.)

 Count 1 charges conspiracy among Cisneros, Medlar, Arce-
Garcia, and Rosales, in violation of 18 U.S.C. s 371. Counts 2 
through 17 charge Cisneros with violating 18 U.S.C. s 1001. 
Count 18 charges him with obstruction of justice, in violation 
of 18 U.S.C. s 1505, by influencing and impeding the Justice 
Department's inquiry into whether to grant him a security 
clearance.


 II

 A.

 As to Counts 2 through 17, Cisneros's argument on appeal, 
like his motion to dismiss, proceeds as follows. To prove the 
violation of 18 U.S.C. s 1001,1 as alleged in each of these 
counts, the government would have to show that the facts 
Cisneros concealed or the false statements he made on his 
SF-86 and to the FBI were "material." See United States v. 
Hansen, 772 F.2d 940, 949 (D.C. Cir. 1985). "The 'central 
object' of any materiality inquiry is 'whether the misrepresen-
tation or concealment was predictably capable of affecting, 
i.e., had a natural tendency to affect, the official decision.' " In 
re Sealed Case (Lewinsky), 162 F.3d 670, 673-74 (D.C. Cir. 
1998) (quoting Kungys v. United States, 485 U.S. 759, 771 
(1988)). Cisneros argues that "courts may not adjudicate" 
materiality in this case. As he sees it, the separation of 
powers doctrine precludes the Judicial Branch from consider-
ing what information would be capable of influencing the 
President or the Senate in evaluating prospective cabinet 
officers. Hence, materiality cannot be established and Cisne-
ros cannot be convicted of violating s 1001. Brief for Appel-
lant at 11-12.2
__________
 1 During the period covered by the Indictment, 18 U.S.C. 
s 1001 read as follows:

 Whoever, in any matter within the jurisdiction of any depart-
 ment or agency of the United States knowingly and willfully 
 falsifies, conceals or covers up by any trick, scheme, or device a 
 material fact, or makes any false, fictitious or fraudulent state-
 ments or representations, or makes or uses any false writing or 
 document knowing the same to contain any false, fictitious or 
 fraudulent statement or entry, shall be fined under this title or 
 imprisoned not more than five years, or both.

 The False Statements Accountability Act of 1996, Pub. L. No. 
104-292, s 2, 110 Stat. 3459, revised this section.

 2 Cisneros also claims that the background investigation was 
not a "matter within the jurisdiction" of the FBI for purposes of 
s 1001 because, in conducting the investigation, the FBI acted 
pursuant to orders of President-elect Clinton, and the President-

 Cisneros stakes out a bold position indeed, and he admits 
as much. As to his specific situation, he maintains that the 
information he allegedly falsified and the facts he allegedly 
concealed did not influence President-elect Clinton's decision 
to nominate him. He backs this up with an off-the-record 
assertion. According to Cisneros, he made the President-
elect and the Transition Team "fully aware" of the "informa-
tion about which he allegedly deceived the FBI" and the 
President-elect nevertheless decided not to withdraw his nom-
ination. Brief for Appellant at 25 n.13.3 Apart from the 
particulars of his nomination, Cisneros believes that no poten-
tial Presidential appointee undergoing a background investi-
gation has a judicially enforceable obligation to tell the truth 
in filling out forms or in talking with FBI agents. In other 
words, if such an individual falsified information about himself 
or covered up his misconduct, no legal consequences could 
follow. Judge Sporkin thought that Cisneros's "position 
would allow unqualified candidates for high public office to lie 
their way into extremely sensitive and important positions of 
government." Memorandum Opinion and Order, Sept. 17, 
1998, at 5 (denying appellant's motion for reconsideration). 
Relying on our holding on the merits in United States v. 
Durenberger, 48 F.3d 1239 (D.C. Cir. 1995), Judge Sporkin 
denied Cisneros's motion to dismiss, rejecting his argument 
that the prosecution impermissibly intruded upon the prerog-
atives of the executive and legislative branches to nominate 
and confirm prospective Cabinet members. Memorandum 
Opinion, July 30, 1998, at 12-14.

 Whether Judge Sporkin ruled correctly is not our immedi-
ate concern, however. Without a judgment ending the case 
on the merits and leaving "nothing for the court to do but 
execute the judgment," Catlin v. United States, 324 U.S. 229, 

__________
elect is not a "department or agency of the United States." See 
Brief for Appellant at 34-35. We agree with a concession Cisneros 
makes elsewhere in his brief: "these issues are not directly before 
the Court." Id. at 10 n.6.

 3 Given our disposition of this appeal on jurisdictional grounds, 
we reach no judgment about the relevance of any of this.


233 (1945), the courts of appeals generally do not have 
appellate jurisdiction. Here the trial has not even begun. 
Proceedings in the district court remain on hold pending the 
completion of this appeal. Already more than two years have 
passed since the indictment came down. Avoiding delay is 
one of the reasons behind the final judgment rule. See 28 
U.S.C. s 1291. Avoiding piecemeal review is another.

 Still, Cisneros insists that we have jurisdiction to review 
Judge Sporkin's order refusing to dismiss Counts 2 through 
17 because this was a "collateral order" of the sort mentioned 
in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 
(1949).4 While the collateral order doctrine of Cohen is 
sometimes described as an exception to the final judgment 
rule, it is more accurately treated as an interpretation of 
"final decisions" as used in 28 U.S.C. s 1291. See Digital 
Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 867 (1994). 
To come within the Cohen doctrine, "the order must conclu-
sively determine the disputed question, resolve an important 
issue completely separate from the merits of the action, and 
be effectively unreviewable on appeal from a final judgment." 
Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978).

 In criminal cases, "the compelling interest in prompt trials" 
demands that courts apply the Cohen doctrine "with utmost 
strictness" and confine its scope. Flanagan v. United States, 
465 U.S. 259, 265 (1984); see also United States v. Hollywood 
Motor Car Co., 458 U.S. 263, 270 (1982). In the years since 
Cohen, the Supreme Court has rarely permitted criminal 
defendants to appeal pretrial orders. The Court has identi-
fied only three types of motions in criminal proceedings 
whose denial falls within the collateral order category: "mo-
tions to reduce bail, Stack v. Boyle, 342 U.S. 1 (1951), motions 
to dismiss on double jeopardy grounds, Abney v. United 
States, 431 U.S. 651 (1977), and motions to dismiss under the 
Speech or Debate Clause, Helstoski v. Meanor, 442 U.S. 500 
(1979)." Midland Asphalt Corp. v. United States, 489 U.S. 
794, 799 (1989). Orders denying such motions, the Court has 

__________
 4 The government initially believed the same, but in post-
argument supplemental briefing it altered its view.

determined, would be "effectively unreviewable on appeal 
from a final judgment," for obvious reasons with respect to 
denials of bail, and in the cases of double jeopardy and speech 
and debate, because the defendant is asserting a right not to 
be tried.

 The order Cisneros seeks to appeal, insofar as it refused to 
dismiss Counts 2 through 17, does not come within the 
collateral order doctrine for several distinct reasons. Each of 
these sixteen counts alleges that Cisneros's false statements 
or his concealment of material facts--all of which occurred 
before he took office--related to "a matter within the jurisdic-
tion of departments and agencies of the United States, that is, 
the Federal Bureau of Investigation and the United States 
Department of Justice...." See, e.g., Indictment, Count 2, 
p 5. With this in mind, the government suggests that the 
separation-of-powers issue Cisneros is raising here might 
never arise at trial. Brief for Appellee at 26 n.12. The point 
is well-taken. In s 1001 prosecutions, it is up to the jury to 
decide whether the materiality element has been proven. 
United States v. Gaudin, 515 U.S. 506, 523 (1995). In 
instructing the jury, Judge Sporkin could define "materiality" 
with reference, not to the President's nomination decision or 
the Senate's confirmation decision, but to the FBI's investiga-
tive role under the Memorandum of Understanding and Exec-
utive Order No. 10450, and to the decision of the Department 
of Justice on Cisneros's security clearance. Much will depend 
on the trial evidence and on the government's (and the 
defendant's) proposed instructions. See Fed. R. Crim. P. 30. 
The district judge has not yet made a final decision on jury 
instructions, nor could he at this stage. Jury instructions 
"must be specifically tailored to the pleadings and evidence of 
the particular case.... Conduct alleged in the indictment, 
but not supported by evidence at trial, for example, should 
not be included in any instruction to the jury." Edward J. 
Devitt et al., 1 Federal Jury Practice and Instructions at III 
(4th ed. 1992); see, e.g., United States v. Harrington, 108 
F.3d 1460, 1471 (D.C. Cir. 1997). While the judge firmly 
rejected Cisneros's separation-of-powers argument with re-
spect to Counts 2 through 17, it therefore does not necessari-


ly follow that he will instruct the jury in the terms Cisneros 
opposes. If we allow this appeal, we risk deciding a constitu-
tional question that might evaporate were the case allowed to 
go to trial, free of appellate interruption. Refusing to adjudi-
cate constitutional issues unless it is strictly necessary to do 
so is a time-honored practice of judicial restraint. See Arizo-
nans for Official English v. Arizona, 520 U.S. 43, 78-79 
(1997); Youakim v. Miller, 425 U.S. 231, 236 (1976); Rescue 
Army v. Municipal Court of Los Angeles, 331 U.S. 549, 570 
n.34 (1947). The final judgment rule complements this prac-
tice. Piecemeal review causes an appellate court to decide 
issues that might not have survived if the case had proceeded 
directly to trial. See, e.g., Johnson v. Jones, 515 U.S. 304, 309 
(1995); Hollywood Motor Car Co., 458 U.S. at 265. Cohen 
itself, as well as later Supreme Court decisions, thus indicate 
that district court orders "subject to reconsideration from 
time to time" during trial do not qualify as "final decisions" 
subject to immediate appeal. Cohen, 337 U.S. at 546-47; 
Clinton v. Jones, 520 U.S. 681, 690 n.11 (1997); Coopers & 
Lybrand, 437 U.S. at 469; United States v. MacDonald, 435 
U.S. 850, 858-59 (1978); Ficken v. Alvarez, 146 F.3d 978, 980 
(D.C. Cir. 1998). This last point is particularly telling here. 
During the course of Cisneros's trial, there will doubtless be 
opportunities for the district judge to revise and refine the 
analysis contained in his order refusing to dismiss the 
charges. In making evidentiary rulings and in formulating 
jury instructions the court will necessarily be deciding to 
what extent it will adhere to its initial judgment regarding 
Cisneros's claim that materiality cannot be defined in terms 
of the President's or the Senate's determinations of the 
suitability of nominees for high office. The order before us is 
therefore far from the sort of "fully consummated decision" 
qualifying as a collateral order. Abney, 431 U.S. at 659. The 
district judge may not revisit his denial of the motion to 
dismiss, but his underlying rationale would remain subject to 
revision and reconsideration in light of the evidence produced 
at trial. At this point, there is no telling what the evidence 
will be or what instructions the district judge will give on 
materiality.


 There is still another reason why Cisneros cannot fit his 
appeal into the collateral order doctrine. The "right" he 
claims is not one "which would be destroyed if it were not 
vindicated before trial." MacDonald, 435 U.S. at 860. He 
therefore is unable to satisfy the third factor described in 
Coopers & Lybrand. Pretrial denials of a defense based on 
the Double Jeopardy Clause or the Speech or Debate Clause 
fall within the collateral order doctrine because these clauses 
confer immunity not merely from conviction, but from the 
burdens of having to defend against criminal charges. See 
Helstoski, 442 U.S. at 508. The right "which would be 
destroyed if it were not vindicated before trial," MacDonald, 
435 U.S. at 860, is the defendant's constitutional right to be 
free of a trial altogether. The right Cisneros seeks to 
vindicate is quite different. In his opening brief, he framed it 
up this way: "any attempt to adjudicate the materiality 
element of the false statement charges against Mr. Cisneros 
would require a judicial inquiry into matters within the 
constitutional province of coordinate branches." Brief for 
Appellant at 17. This is nothing more than an argument that 
s 1001 is unconstitutional as applied to him. To that extent, 
Cisneros stands in no different position than any other crimi-
nal defendant who loses a pretrial motion attacking an indict-
ment on the ground that the underlying criminal statute is 
unconstitutional. The district court's order in such a case, 
and in Cisneros's case, would be fully reviewable on appeal 
should the defendant be convicted. There is nothing here 
that would be "effectively unreviewable" if the case proceeded 
to trial and final judgment. See United States v. Munoz-
Flores, 495 U.S. 385 (1990). By Cisneros's lights, at least in 
his initial brief, the judicial intrusion he identifies--the viola-
tion of separation of powers--would flow from an "adjudica-
tion," not from holding the trial. See Brief for Appellant at 
15, 17. As we have said before, materiality in a s 1001 
prosecution is for the jury to decide and so, even as Cisneros 
sees it, there would be no deprivation of his right until the 
jury returned a verdict, that is, until the trial ended in 
conviction or acquittal.


 After we called for supplemental briefing on the question of 
appellate jurisdiction, Cisneros reformulated his position. 
Now he tells us that "he is immune from prosecution on 
structural separation of powers grounds," and that "he should 
not be forced to endure a criminal trial where the very 
conduct of the trial itself will violate the separation of powers 
by causing the courts to invade the exclusive constitutional 
province of coordinate branches." Supplemental Brief for 
Appellant at 1-2. In other words, no longer is it the "adjudi-
cation" of materiality that will "violate the separation of 
powers"; it is the "very conduct of the trial." "One must be 
careful," the Supreme Court has reminded us, "not to play 
word games with the concept of a 'right not to be tried.' In 
one sense, any legal rule can be said to give rise to a 'right 
not to be tried' if failure to observe it requires the trial court 
to dismiss the indictment or terminate the trial. But that is 
assuredly not the sense relevant for purposes of the exception 
to the final judgment rule." Midland Asphalt Corp., 489 U.S. 
at 801. We do not doubt that Cisneros, like any criminal 
defendant, may raise separation of powers as a defense. See 
Munoz-Flores, 495 U.S. at 394. But it scarcely follows that 
whenever a defendant relies on the separation-of-powers doc-
trine, the defendant's right must be treated as if it rested on 
an "explicit ... guarantee that trial will not occur." Midland 
Asphalt Corp., 489 U.S. at 801. Most separation-of-powers 
claims are clearly not in that category. See, e.g., Mistretta v. 
United States, 488 U.S. 361 (1989). A few may be. For 
instance, a trial court's order denying a President's claim of 
separation-of-powers immunity from civil actions during his 
term of office falls within the collateral order doctrine: the 
right asserted would be irretrievably lost if there could be no 
immediate appeal. See Clinton, 520 U.S. at 690; Jones v. 
Clinton, 72 F.3d 1354, 1357 n.4 (8th Cir. 1996).

 Nothing Cisneros argues amounts to a right not to be tried. 
He cannot point to anything guaranteeing him an immunity 
from standing trial. What he alleges is a constitutional 
affront flowing from an adjudication of materiality. This is 
not an affront to Cisneros personally. His complaint is aimed 
at a supposed infringement of the President's authority and of 


the Senate's. Yet trying him would not itself interfere with 
the President's nomination judgments or with the Senate's 
advise-and-consent function. During Cisneros's trial the 
President could continue nominating whomever he pleased, 
and the Senate could continue confirming, or refusing to 
confirm, those nominees for whatever reasons it saw fit. The 
short of the matter is that neither the President's nor the 
Senate's constitutional powers would be forever lost if Cisne-
ros could appeal only after the jury returned its verdict.

 For these reasons and others, Cisneros cannot bring his 
appeal within the jurisdictional holding of United States v. 
Rose, 28 F.3d 181 (D.C. Cir. 1994), or the jurisdictional 
rulings in our two decisions following Rose--United States v. 
Durenberger, 48 F.3d 1239 (D.C. Cir. 1995), and United 
States v. Rostenkowski, 59 F.3d 1291 (D.C. Cir. 1995). The 
defendant in each of these cases was a member of the 
legislative branch when he committed the alleged wrongful 
act for which he was being tried.5 Rose, a member of the 
House of Representatives, defended against a civil penalty 
action for filing false financial reports with the Clerk of the 
House, in violation of the Ethics in Government Act of 1978. 
He appealed from the district court's orders denying his 
pretrial motion to dismiss the case. Rose's motion contended 
that forcing him to endure a trial would violate his Speech or 
Debate Clause immunity because the government planned to 
use his testimony before the House Committee on Standards 
of Official Conduct, which had investigated the matter. To 
the extent the district court order rejected this claim, it fell 
within a category of collateral orders recognized as immedi-
ately appealable, and we so held. 28 F.3d at 185. Rose also 
contended in the lower court that he had complete immunity 
from trial, under the separation of powers doctrine, because 
the Constitution gave each House the power to regulate the 
conduct of its members and because the House Committee 
had already investigated and sanctioned him. Id. at 184, 189-

__________
 5 While Rose was a civil action, Durenberger and Rostenkowski 
were criminal proceedings. The court in Rose drew no distinction 
between the two types of proceedings. 28 F.3d at 186.


90. Rose's alleged right--his right to be free from having his 
conduct examined outside the House--was, we believed, 
closely akin to a claim of Speech or Debate Clause immunity. 
We therefore treated the order as immediately appealable. 
Id. at 186.

 Implicit in Rose, and in our later jurisdictional holdings in 
Durenberger and Rostenkowski, was our recognition that the 
Speech or Debate Clause of Article I, s 6, manifested the 
Constitution's separation of powers. Designed to "prevent 
intimidation by the executive and accountability before a 
possibly hostile judiciary," the Speech or Debate Clause 
reinforces the separation of powers and protects legislative 
independence and integrity. United States v. Johnson, 383 
U.S. 169, 181 (1966); see also United States v. Brewster, 408 
U.S. 501, 524-25 (1972); Gravel v. United States, 408 U.S. 
606, 616-17 (1972). It does so by conferring a personal 
privilege on individual legislators. Brewster, 408 U.S. at 524. 
The argument in Rose, although ultimately rejected, 28 F.3d 
at 190, was that the separation-of-powers doctrine conferred 
on Rose an analogous and comparable privilege from having 
to defend his actions as a Congressman in a civil penalty suit. 
Durenberger and Rostenkowski are to the same effect. Like 
Rose, former Senator Durenberger claimed an immunity, 
based on separation of powers, from having to answer crimi-
nal charges depending, so he claimed, on the judiciary's 
usurpation of the Senate's exclusive rulemaking authority and 
statutory authority to make payments on vouchers conclusive. 
Quoting Rose, we found Durenberger's alleged right not to be 
tried sufficiently close to Speech or Debate Clause immunity 
and therefore allowed an immediate appeal of the district 
court's order denying his contentions. 48 F.3d at 1242. In 
Rostenkowski we first held that the former Congressman's 
appeal from the denial of his motion to dismiss the indictment 
was within the collateral order doctrine because he had 
claimed immunity under the Speech or Debate Clause. 59 
F.3d at 1297. After explaining why orders denying immunity 
under the Clause were immediately appealable, we said that 
for "similar reasons" we would hear Rostenkowski's addition-
al argument that his dismissal motion should have been 

granted on the ground that the separation of powers doctrine 
immunized him from being tried. Id.

 Cisneros obviously cannot rely on the analogy to Speech or 
Debate Clause immunity we found persuasive in Rose, Duren-
berger, and Rostenkowski. During the period covered by 
Counts 2 to 17, Cisneros was a member of no branch of 
government.6 His separation-of-powers contention rests on 
the proposition that the President has the sole discretion to 
decide what is important in making nomination decisions. 
Try as he might, Cisneros cannot stretch that claim into an 
immunity for prospective nominees from being tried for lying 
to the FBI during their background investigations. The 
immunity, if any, is the President's alone. And as we have 
said before, if there is merit to Cisneros's claim about judicial 
infringement on the President's (and the Senate's) preroga-
tives, and if the issue is finally determined at his trial, there 
will be time enough in an appeal from the final judgment to 
vindicate the separation of powers.

 In short, the order refusing to dismiss Counts 2 through 17 
is not a final decision under 28 U.S.C. s 1291 because it did 
not "conclusively determine" how the jury will be instructed 
on materiality and because Cisneros's separation-of-powers 
claim would not "be effectively unreviewable on appeal from a 
final judgment." Coopers & Lybrand, 437 U.S. at 468.

 B.

 The balance of the opinion discusses why the order, insofar 
as it refused to dismiss Count 1 and Count 18, also fails to 
come within the Cohen collateral order doctrine and thus may 
not be appealed prior to trial.

 Count 1 charges Cisneros and others with having engaged 
in a conspiracy from the summer of 1992 through September 

__________
 6 There is some irony in the fact that the argument about 
judicial interference with the powers of the executive branch is 
offered as a defense to a prosecution brought by the executive 
branch for crimes arising out of an investigation conducted by the 
executive branch.

1994. The objects of the conspiracy were to defraud the 
United States by impeding the advise-and-consent function of 
the Senate, the function of the FBI in conducting background 
investigations pursuant to Executive Order No. 10450, and 
the function of the Department of Justice Personnel Security 
Office in determining whether Cisneros warranted a top 
secret national security clearance; and to violate s 1001, to 
obstruct pending Senate and Justice Department inquiries in 
violation of 18 U.S.C. s 1505, and to structure payments to 
Medlar in order to evade the financial reporting requirements 
contained in 31 U.S.C. s 5313(a). Among the overt acts 
alleged were: Cisneros's payments to Medlar during the 
conspiracy, including two separate cash payments of $8000 
each on December 16 and 18, 1992 (breaking down cash 
transactions totaling over $10,000 into smaller sums for the 
purpose of evading the reporting requirement constitutes 
impermissible structuring, even if the transactions are con-
ducted over the course of several days, see 31 C.F.R. 
s 103.11(gg)); telephone calls between Cisneros and Medlar; 
his liquidation of an annuity account he maintained; a meet-
ing between President-elect Clinton and Cisneros; Cisneros's 
completion of the SF-86 and a supplement thereto; his 
meetings with the FBI; his testifying before the Senate 
Banking Committee, which held his confirmation hearing; 
and his issuance of a press release in July 1994 stating that 
he had made no payments to Medlar since becoming HUD 
Secretary in January 1993 (the Indictment alleged he had 
paid her more than $70,000 during this period). All told, 64 
separate overt acts are alleged.

 While it is simple enough to understand why Cisneros 
believes the s 1001 charges (Counts 2-17) violate the separa-
tion of powers, it is no small feat to figure out why he thinks 
the same argument entitles him to an immediate appeal of the 
order refusing to dismiss Count 1.7 It is true that one of the 

__________
 7 Count 1 is not separately discussed in Cisneros's supplemen-
tal brief. The caption heading in Cisneros's opening brief--
"COUNTS 1-17 ARE NONJUSTICIABLE BECAUSE THE 
COURTS MAY NOT INQUIRE INTO THE CRITERIA OR PRO-


several objects of the conspiracy was to violate s 1001. Per-
haps Cisneros believes he could be convicted of conspiring 
only if materiality were proven. If this is the basis for his 
claim of a right not to be tried on Count 1, then what we have 
already written disposes of the contention. Still, it is worth 
adding that on the face of the Indictment it is far from clear 
that even this single object of the conspiracy would necessari-
ly require proof that Cisneros's false statements were materi-
al because they were capable of influencing the President and 
the Senate. Counts 19, 20, and 21 allege separate s 1001 
violations by Cisneros's co-conspirators Rosales and Medlar. 
There is no contention that adjudicating the materiality of 
their false statements would impinge upon the prerogatives of 
the political branches. If the evidence showed that Cisneros 
conspired with Rosales and Medlar so that these two co-
conspirators would lie to the FBI, Cisneros would have no 
claim to separation-of-powers immunity, or at least no claim 
that he has made thus far. Furthermore, violating s 1001 is 
but one of many objects of the conspiracy alleged in the 
Indictment. With respect to some of the other objects of the 
conspiracy--to violate the anti-structuring law, for instance--
we cannot imagine any viable separation-of-powers objection. 
For all these reasons, there is no basis whatever for treating 
the court's order refusing to dismiss Count 1 as a final 
decision. For all anyone knows, the evidence of conspiracy 
introduced at trial will have nothing whatever to do with 
anything Cisneros is attempting to have us decide in this 
appeal. See supra pp. 8-9.

 To the extent the order refused to dismiss Count 18, it too 
is not appealable as a final decision. This count charges 
Cisneros with corruptly influencing and obstructing "the due 
and proper administration of the law under which any pend-
ing proceeding is being had before any department or agency 
of the United States," 18 U.S.C. s 1505--the pending pro-

__________
CEDURES USED BY THE PRESIDENT AND SENATE TO 
EVALUATE PROSPECTIVE CABINET OFFICERS"--is fol-
lowed by page after page of text arguing that "counts 2-17" must 
be dismissed for this reason. See, e.g., Brief for Appellant at 15, 24, 
27, 32.

ceeding being the adjudication by the Justice Department of 
his security clearance. Cisneros has presented no argument 
focusing on Count 18 to explain why the denial of his motion 
to dismiss this count comes within the collateral order doc-
trine. Given the nature of this charge, his materiality conten-
tions regarding Counts 2 through 17 simply do not apply. His 
argument for dismissing Count 18 was that the executive 
branch has sole and unreviewable authority to decide whether 
to issue security clearances; that the judiciary cannot deter-
mine the criteria used to award security clearances; and 
hence, the court could not determine whether his alleged 
deceits corruptly obstructed the Justice Department's deter-
mination. See Brief for Appellant at 42. The Executive 
Branch also "has exclusive authority and absolute discretion 
to decide whether to prosecute a case," United States v. 
Nixon, 418 U.S. 683, 693 (1974), but it would be absurd to 
suppose that anyone who was the subject of an agency 
investigation would, for that reason, have a right not to be 
tried for obstructing justice. See United States v. Kelley, 36 
F.3d 1118, 1127 (D.C. Cir. 1994). Cisneros's defense does 
not, in short, translate into an immunity from prosecution. 
Put differently, the district court's order refusing to dismiss 
Count 18 is not by any stretch "effectively unreviewable on 
appeal from a final judgment." Coopers & Lybrand, 437 U.S. 
at 468.

 For the reasons given, the district court's order refusing to 
dismiss Counts 1 through 18 is not a "final decision" under 28 
U.S.C. s 1291.

 Appeal dismissed.